**Reverend Calvin O. BUTTS III and Digna Sanchez, on behalf of themselves and all others similarly situated, Plaintiffs,**

v.

**CITY OF NEW YORK, New York City Board of Elections, Election Commissioners Matteo Lumetta, Ferdinand C. Marchi, Rosemary A. Millus, Joseph J. Previte, Martin Richards, James S. Bass, Alice Sachs, Anthony Sadowski, Betty Dolen, Executive Director, Robert S. Black, President, and Orlando Velez, Secretary, Defendants.**

No. 84 Civ. 7373–CLB.

United States District Court,
S.D. New York.

Aug. 13, 1985.

Randolph M. Scott-McLaughlin, C. Vernon Mason, Juan Saavedra-Castro, New York City, for plaintiffs.

Frederick A.O. Schwarz, Jr., Corp. Counsel for City of New York by Beth G. Schwartz, Thomas C. Crane, and Elizabeth J. Logan, New York City, for defendants.

BRIEANT, Judge.

Plaintiffs, suing in behalf of a class consisting of all present and/or potentially eligible Black and Hispanic voters residing in New York City, seek injunctive and declaratory relief holding that New York Election Law § 6-162 violates the United States Constitution, the Voting Rights Act, 42 U.S.C. § 1973, and the Civil Rights Act, 42 U.S.C. §§ 1981, 1983. The challenged New York statute is a run-off primary law, applicable only to the City of New York and there only to the three city-wide offices. It states in full:

> "In the city of New York, when no candidate for the office of mayor, city council president or comptroller receives forty per cent or more of the votes cast by the members of a political party for such office in a city-wide primary election, the board of elections of such city shall conduct a run-off primary election between the two candidates receiving the greatest number of votes for the same office."

This statute was enacted originally in 1972 and made applicable to cities with a population of one million or more. New York is the only such city. In 1976 and 1978 the state legislature amended the statute to read as quoted above. In every other city in the state, and in elections for noncity-wide offices in New York City, New York Election Law § 6-160 applies. It provides that in any contested primary,

whoever wins the most votes becomes the party nominee.

Since 1972, a total of three run-off primary elections have been held in New York City pursuant to the statute. All were held for the Democratic Party. Two run-offs were for the mayoral nomination and the third was for nomination for the office of City Council President.

Plaintiffs Calvin O. Butts and Digna Sanchez are representatives of a class consisting of all present and/or potentially eligible Black and Hispanic voters residing in New York City. This action was certified as a class action pursuant to Rule 23, F.R. Civ.P., following a February 11, 1985 hearing at which this Court made oral findings. Adequate notice of the pendency of the class action was published; no plaintiff class members requested exclusion.

As originally filed on October 15, 1985, this action named the State of New York and its Governor as defendants. On December 21, 1984 the Attorney General of New York submitted a consent order dismissing the State and the Governor as defendants. This was proper. On January 3, 1985, the Clerk of the Court provided statutory notice, required under 28 U.S.C. § 2403(b), informing the Attorney General that plaintiffs here challenge the constitutionality of New York Election Law § 6-162. Since that date the Attorney General has declined to appear or defend the validity of the statute in this Court. *See* Endorsement Order of January 3, 1985 in this action.[1]

This Court conducted a non-jury trial beginning on June 3, 1985 and concluding on June 10, 1985. The parties were permitted to submit post-trial memoranda which have been filed and considered. There follows the Court's findings of fact and conclusions of law.

Plaintiffs essentially contend that the run-off primary law infringes upon the constitutional rights of Black and Hispanic voters to equal protection and due process,

---

1. Although the State's Attorney General declined to appear, the challenged statute was defended skillfully by Beth G. Schwartz, Thomas C. Crane, and Elizabeth J. Logan, attorneys of counsel to Frederick A.O. Schwarz, Jr., Corporation Counsel for the City of New York.

and that the operation of the run-off statute was intended to and does make it more difficult for a Black or Hispanic candidate to emerge as the party nominee. Plaintiffs offered evidence in support of the theory that the effect of the run-off statute is to give class members less opportunity than other members of the electorate to participate successfully in the electoral process to the extent of nominating members of their class. Defendants claim that the statute has no discriminatory impact on any particular social, racial or ethnic group in New York City.

As will be anticipated by any reader vaguely familiar with New York City politics, the evidence in this case included animated testimony concerning the recent history of Democratic party affairs, the ever changing atmosphere of race relations in the City, and the recent campaigns of various office seekers. Plaintiffs offered the testimony of three prominent political figures, Herman Badillo, a Hispanic, and Basil Paterson and Percy Sutton, both of whom are Black. Each witness described his personal experiences in city-wide election campaigns in terms both vivid and trenchant. In addition, experts appeared for both plaintiffs and defendants to express their opinions from a more academic perspective.

The facts which have emerged from the trial testimony and the documentary exhibits are these. In 1973, there were four candidates in the initial primary for Mayor—Mario Biaggi, Albert Blumenthal, Herman Badillo, and Abraham Beame. The percentages of total votes obtained by each of the candidates were:

| Abraham Beame | 34.5% |
| Herman Badillo | 29.0% |
| Mario Biaggi | 20.5% |
| Albert Blumenthal | 16.0% |

A run-off election was held in which Mr. Beame resoundingly defeated Mr. Badillo, by the following percentages of the total votes cast:

| Abraham Beame | 61% |
| Herman Badillo | 39% |

In 1977, there were seven candidates seeking the Democratic Party nomination for Mayor—Edward Koch, Mario Cuomo, Abraham Beame, Bella Abzug, Percy Sutton, Herman Badillo and Joel Harnett. The results of the initial primary election were as follows:

| Edward Koch | 20.0% |
| Mario Cuomo | 19.0% |
| Abraham Beame | 18.0% |
| Bella Abzug | 16.5% |
| Percy Sutton | 14.0% |
| Herman Badillo | 11.0% |
| Joel Harnett | 1.5% |

Mr. Koch was the winner of the 1977 run-off primary, defeating Mr. Cuomo. He received 55% of the total votes cast.

In the third run-off primary, held in 1977 for the office of City Council President, the results were as follows. In the initial primary there were five white candidates who received these percentages of total votes cast:

| Paul O'Dwyer | 31% |
| Carol Bellamy | 25% |
| Carter Burden | 20% |
| Abraham Hirschfield | 17% |
| Leonard Stavisky | 7% |

Ms. Bellamy won the run-off election with 59% of the vote, defeating the incumbent, Paul O'Dwyer. Ms. Bellamy, who also won the general election, is currently serving as City Council President and is a candidate for the 1985 Democratic nomination for Mayor.

As can be gleaned from the figures stated above, except for Mr. Badillo, no Black or Hispanic candidate has participated in a run-off primary under this statute. In recounting his political career, Mr. Badillo told the Court that he held his first elective office beginning in 1965 when he served as Borough President of the Bronx. In 1970, Mr. Badillo began the first of four elected terms as a United States Congressman. In 1970 he was elected to Congress as a representative of a tri-borough district covering a portion of the South Bronx, a portion of Manhattan in East Harlem, and Astoria, a

portion of Queens. For his second, third and fourth terms he was elected from a Congressional District covering only the South Bronx.

In 1969, prior to the adoption of the challenged statute, there was a contested primary for the Democratic nomination for Mayor. Mr. Badillo, the only minority candidate, nearly won. The results were as follows:

| | |
|---|---|
| Mario Procaccino | 33% |
| Robert Wagner | 29% |
| Herman Badillo | 28% |
| James Scheur | 5% |
| Norman Mailer | 5% |

Mr. Badillo testified that:

"The general view of the campaign is that I lost to Mario Procaccino by 38,000 votes, which was astonishing because of the fact that Norman Mailer got about 42,000 votes and Norman Mailer carried—not carried but got votes in the [Greenwich] Village and other areas which I had done very well in, so it was clear that if Mailer had not been a candidate I would have won the primary.

That was surprising because of the fact that since no Puerto Rican had ever run for citywide office before, people suspected I would only get 5 or 10 percent of the vote. No one thought I would come within that narrow a margin of winning." (Tr. 81).

The final results of the 1969 general election for Mayor were that incumbent John Lindsay, running that year as an Independent and Liberal Party candidate, won in a three way race, receiving about 42% of the total vote. The Democratic nominee, Mario Procaccino, was defeated. The experiences of 1969 inspired the enactment of the run-off statute, which was known in Albany legislative circles as the "Badillo bill", or perhaps more properly the "anti-Badillo bill".

Mr. Badillo made a second try for the mayoral nomination in 1973, after the enactment of the run-off statute, and achieved the second highest percentage of votes cast. According to his testimony, which we consider credible since it can be assumed that a political candidate can and will review and evaluate his own election results with some reasonable degree of accuracy, Mr. Badillo received support from essentially the same groups of voters in 1973 as he had in 1969. That is, most of his votes came from the Bronx, where he had served as Borough President and Congressman, and from "Manhattan and the black, Hispanic and so-called liberal areas of Brooklyn and Queens." (Tr. 79). Mr. Badillo received votes from white voters whom he described as "the liberals which were then known as reformers...." (Tr. 88) This testimony is generally in conformity with the testimony of other witnesses to the effect that there exists a significant constituency of liberal white New York City Democratic voters who will support a qualified Black or Hispanic candidate.

In describing his 1973 campaign experiences, Mr. Badillo provided support for one of plaintiffs' dominant factual arguments underlying their legal theory—the importance of campaign funding and its enhanced importance during a short run-off campaign period as provided for here. First, Mr. Badillo explained that his political philosophy and platform and indeed that of most minority candidates and those who support them, do not appeal to most wealthy donors or special economic interests because it focuses on "liberal" or redistributive policies such as rebuilding poor areas of the City and developing educational and employment programs for the poor at the expense of and sometimes to the detriment of other interests in the body politic. Mr. Badillo described his campaign as a "street campaign", dependent, not on big money or big media, but rather upon personal appearances which reach voters without substantial expenditures of money. For example, while campaigning for the Bronx Borough Presidency, Mr. Badillo set as his goal shaking 5,000 hands every weekday and 9,000 hands on Saturdays and Sundays. According to his testimony, "there are two types of campaigns. One is a media campaign based on money. The other one is a street campaign based upon

your physical presence in the neighborhoods. The media campaign can be a short campaign, and that's what the run-off is geared for." (Tr. 90).

In addition to testifying that as a representative of minority and poor interests Mr. Badillo did not generally have the support of wealthy campaign contributors, and therefore lacked the ability to purchase radio and television time, Mr. Badillo stated that he also faced difficulty obtaining "free" media coverage. According to this witness, a candidate who tries to call a press conference in a poor urban area, or who wants to talk about problems of the poor at a press conference, does not receive the media attendance enjoyed by conferences held in midtown Manhattan, or the attention paid to other issues.

Finally Mr. Badillo described personal experiences in campaign events characterized by their racial tone, which took place during the short 1973 run-off period, but *not* during the longer initial campaign period. During the 21 day run-off period between the initial primary election on June 4, 1973 and the secondary primary election on June 26, Badillo's opponents distributed literature misrepresenting or emphasizing Badillo's position on issues said to have racial connotations, such as scatter site subsidized housing and employment quotas and busing of students. There were flyers distributed connecting Badillo to "slum country" and to groups perceived as violent such as the Black Panthers and the Young Lords, a Puerto Rican organization which had recently captured and occupied the Lincoln Hospital and a Baptist Church in East Harlem under threat of force.

This "campaign literature" speaks eloquently as to how a short run-off campaign may be made nasty by direct appeals to racial or ethnic bias. Exhibit 26, used in the run-off is a two-sided flyer or handbill, featuring a picture of slum dwellings, accompanied by the caption "This is the Bronx Herman Badillo helped to build. Don't let him do this to New York." The reverse side of Exhibit 26 states: "Elect Abe Beame, a Mayor for all the people on June 26. Our last chance to save New York City."

Exhibit 27 used also in the 1973 run-off is a flyer printed both in Italian and English which states:

"If you don't vote for Abe Beame on Tuesday, blame yourself on Wednesday. Abe Beame's opponent supports ... scatter-site housing ... busing ... quotas in hiring and education ... [and] Abe Beame's opponent is supported by the Black Panthers and Young Lords."

According to the witness, Badillo, Exhibit 27 was distributed in Italian-American neighborhoods in New York City, and was designed to frighten such residents into voting for Beame in the run-off to protect their neighborhood and life style. (Tr. 107). An examination of this exhibit would seem to indicate on its face that it was printed with the run-off primary in mind, and after the field had narrowed to two candidates. It is probably insignificant whether the flyer contained patently false statements as to Mr. Badillo's actual position on any particular issues. He testified, however, that his true position was well publicized through debates with other candidates and news coverage insofar as concerns issues such as busing and quotas. Although in favor of busing he had never endorsed quotas and has always supported the merit system of job employment. (Tr. 107, 114) Whether completely false or only partly false the campaign literature used in the run-off primary contains a rather unsubtle racial appeal aimed at misleading white voters who are against quotas in hiring and education and constitutes a rather naked appeal to the racial prejudice which many majority voters are reliably believed to possess. (*See* Tr. 55–61).

We do not suggest that this leaflet or any of the similar materials presented at trial were actually the work of Abraham Beame, or persons acting with his authority. Mr. Beame is generally perceived to be of moderate political views and indeed was described at trial as being essentially a "technocrat". This point itself is of significance, however, because in a short run-off campaign it is possible for the question of the authenticity of a particular statement

to be fudged until after the election is over. In a lengthy campaign, such as the ordinary primary contest, unfair appeals to racial bias are generally counter productive because they can be investigated, exposed and criticized; but in the short period of a run-off this usually cannot be done and an unauthorized blow strikes just as hard as one which was issued with authority.

Exhibit 29 is essentially in the same vein. It is a paid political advertisement in a local Brooklyn newspaper, The Canarsie Courier, which appeared five days before the Beame-Badillo run-off election. This advertisement falsely describes Badillo as a supporter of "a quota system rather than a merit system" and represents Mr. Badillo as associated with one Luis Fuentes, a Puerto Rican school district official who had been involved in a recent dispute concerning the affairs of a community school district in Manhattan's Lower East Side, which dispute had negative racial or ethnic overtones.

Exhibit 30 calls on voters to "Vote for Beame on June 26, 1973. Vote as if your life depends on it, because it does. He will save New York City." This piece of literature, an advertisement in The Jewish Press, dated Friday, June 22, 1973, was, according to the witness, also an appeal to prejudice made during the run-off campaign period:

"Q. The phrase that to "vote as if your life depends on it, because it does," what did you take that to mean?

A. An appeal to racism. An appeal to threaten the life style of the Jewish community if they were to vote for me, and therefore it was an appeal for Jewish people to vote for Abe Beame on the grounds that he would preserve that life style, and I wouldn't, which of course is absolutely false." (Tr. 116).

Exhibit 31 is a phony page from a nonexistent newspaper, "The Brooklyn News", also dated during the run-off period. This piece of literature contains statements such as "Badillo wants Forest Hills type projects

throughout the city except where he lives." At the time there was a public controversy over a proposal to erect subsidized "scatter-site" housing in a luxury neighborhood. It also features a photograph of slums with the label, "Badillo Country."

In addition to the literature distributed during the 1973 run-off period, Mr. Badillo testified that his opponents devised another novel tactic, a flatbed truck carrying a group of Black and Hispanic bongo drum players, reportedly playing drums from ten o'clock at night until one o'clock in the morning while driving through white, residential areas of Brooklyn, the Bronx and Queens, and saying "Vote for Badillo so we can take over City Hall." Mr. Badillo testified that an investigative reporter for the weekly newspaper *Village Voice*, tagged the flatbed truck "the Stanleymobile" because the idea was said to have originated with Stanley Steingut, then Speaker of the Assembly and also chief sponsor of the bill which became N.Y. Election Law § 6–162. (Tr. 96).[2]

In Mr. Badillo's opinion racial appeals to voters are only effective in New York during a one to one campaign:

"The first primary, there were four people involved, and since nobody knew who was going to come off first or second, if I had been eliminated there would be no need for it. This material was obviously held in the event that I would come out first or second in the first primary, because this is what is called negative campaigning. Negative campaigning, any media person will tell you, is most effective in one to one campaigning. It is not effective where you have a multi-candidate campaign because the negative strategy cannot be measured as effectively." (Tr. 108–09).

Mr. Badillo also offered his opinion as to the reason behind the dramatic increase in the number of votes cast for Beame in the run-off. In the initial primary Beame received 34.5% of the votes cast while Badillo

---

**2.** This anecdote is, of course, the rankest hearsay, of the sort which fast becomes a legend in politics.

received 29%. In the run-off primary, Beame's percentage increased to 61% whereas Badillo's grew only ten percentage points—to 39%.

"Q. Is there any way you can attribute the increase in the vote, the dramatic increase for Mr. Beame as opposed to your own increase, but not as dramatic?

A. To the runoff primary. That is the purpose of the runoff primary. The runoff primary, because it has in those days only three weeks, automatically favors the individual who has the most money, and beyond what you have talked about in terms of literature, there were millions of dollars spent by Mr. Beame and his different campaign committees on television, in the newspapers and the radio and in literature, and in a runoff primary the candidate with the most money automatically has the greatest advantage.

Naturally, in my case and as far as I know in case of any black or Hispanic, it would be a very damaging factor since I didn't have comparable amounts of money nor does any black or Hispanic that I know of. Number one.

Number two, when you add to that the appeals to racism, you have the kind of panic that you can set off on a one-to-one campaign where there is a limited period of time because you don't have enough time to overcome this, you don't have enough time to conduct an investigation.

You can complain, as I did in one of the final TV debates.—I complained to Mr. Beame and he claimed that he had nothing to do with the literature but, of course, by the time that complaint was filed, the election was over and all of the investigations that I am talking about did not even begin until after the election was over.

Q. Were you able to raise funds for the runoff campaign in '73?

A. Yes, but not—when you only have three weeks, as I mentioned to you before, most of the funds that I raised were at dinners, hotels or Tavern on the Green, other such places or cocktail parties. It takes time to set up a dinner because you have to send a mailing out and get on the phone and call up people. If you are dependent on that type of resource for fund raising instead of picking up the phone and asking someone for $5,000 or $10,000 or $15,000, if you are dependent on dinners and cocktail parties, by definition a short campaign of less than three weeks would make it very difficult to raise significant amounts of money. (Tr. 120–22).

A second plaintiffs' witness to offer evidence of his personal campaign experience and the expertise which accumulates during a political career was Mr. Percy Sutton, who has been active in New York's Democratic party politics for over thirty years. In fact, Mr. Sutton testified that he lost elections for eleven consecutive years before finally winning a New York State Assembly seat in 1964, representing a district in central Harlem. For eleven years he lost to "whatever candidate had the support of [Congressman] Adam Clayton Powell, Jr." (Tr. 25). This testimony opened the door to a subject covered exhaustively by the academic experts for each side, and discussed more fully below, that is, the subject of party strength and control over primary elections and the nomination process. Without oversimplifying, there was once a time within recent history when party leaders elected by the district leaders or precinct committeemen for each county met often to discuss party affairs and sponsor candidates. They did so under the aegis of a *de facto* citywide leader, although the New York City party machinery does not have a provision for a City Chairman. These county leaders decided with the approval of their supporters who would be the regular, or endorsed party nominees. This they did with a view towards elective success and considering assurances on the part of the candidates that they would be loyal to party principles, channel such party patronage as might exist in the proper approved directions and support the electoral efforts of others. These party leaders often contrived a so called "balanced ticket" where different candidates for different offices possessing different local or

racial or ethnic appeal would add to the strength of each other by running as a slate or team. Furthermore, during this time, now long gone, a selection as the Democratic nominee tended to assure success in the general election and contested primaries were few and far between. That this is no longer true is highly relevant to our discussion of the effect of New York's run-off statute on the opportunity to select candidates and specifically on the opportunity of ascertainable minority groups protected by the Voting Rights Act to exercise their franchise to the fullest extent in order that they and those whom they may support may run for office without being disadvantaged by reason of their minority status.

Mr. Sutton's career spanned the period of evolution during which these changes took place. Remembering the "golden years" of Democratic organization politics in New York, Mr. Sutton commented obiter as follows:

"I have found more morality among persons in government and in politics than I found in business, and I am a businessman. I was a businessman before I went into politics, I am now a businessman with no involvement in politics and the word of people in politics and government that I recall was stronger and could be depended upon more often than those I find in business today." (Transcript p. 47)

This Court with a personal experience of shorter duration in a different party in a different county agrees wholeheartedly.

Mr. Sutton during the years in which he was losing was a so called "reform" candidate opposed to the traditionalist or "machine" candidates sponsored by Congressman Powell, and it cannot be said that any of those contests were racially polarized. The difference if any between reformers and machine politicians is a subjective one and those reformers who gain power tend sooner or later to become machine politicians in their own right attacked in turn for that great sin by a later generation of "reformers". Reformer Sutton in 1966 was chosen by the City Council to serve as Borough President of Manhattan, filling the vacancy created in that office by the resignation of Hon. Constance Baker Motley, now Chief Judge of this Court.

Although the statutory power to fill a vacancy created by such a resignation belongs to the majority of City Council members voting, in reality, when as in 1966 there is a strong and vigorous party organization in New York County with a strong leader and the majority of the City Council belongs to that party, the recommendation of the County leader or the Executive Committee of the party translates into the appointment by majority vote on the Council of the party organization's choice as the candidate to fill the vacancy. As Mr. Sutton put it, "I was selected simply because there was a very strong county organization and the head of that county organization favored me." (Tr. 26). "When I was selected by the City Council in 1966, J. Raymond Jones[3] was the county leader and it was a strong organization, but not nearly as strong as it had been during the days of Tammany Hall and the people before J. Raymond Jones." (Tr. 27–28). Mr. Sutton went on to describe how once he had been appointed it became relatively easy to win election because he had the support of the district leaders and their groups of political workers, and because incumbency in the office provided its own access to media coverage and the sort of community involvement likely to create a favorable image and name recognition with those voters who do not merely vote the party line.

After serving as Manhattan Borough President for almost 12 years, Mr. Sutton became in 1977 the first Black candidate to seek the Democratic nomination for Mayor of the City of New York. Of the seven candidates in the initial primary, Mr. Sutton received 14% of the total number of votes cast, leaving him 5% short of Mario Cuomo, who as runner-up (19%) competed with Edward Koch (20%) in the run-off

3.  Mr. Jones, a highly regarded political leader in New York County, was a Black man elected by a Democratic party organization consisting of a majority of white members.

election. The rest is history. Mr. Cuomo went on to become Governor of the State of New York,—Mr. Koch is currently serving his second term as Mayor while seeking reelection for a third term, and Mr. Sutton is again a businessman.

Although Mr. Sutton never participated in a run-off primary, he encountered some of the same campaign problems described by Mr. Badillo. He was unable to raise the funds required for an effective media campaign, and his campaign suffered because once he announced his candidacy for a citywide office, Mr. Sutton was labelled a "Black" candidate expected to gain only the "Black" vote. (Tr. 46). Mr. Sutton attributed his difficulty in raising funds to the fact that "there were statements made on the radio, television, and in print to the effect that I was not likely to be able to win because of the limited number of Blacks living in New York City...." (Tr. 43). Having the media label him the "Black" candidate came as a surprise and disappointment, he said, because he had spent over twelve years participating in state and local political activities, actively building a broad-based constituency, winning elections in New York County, and had not theretofore been considered or spoken of merely as a "Black politician". Before the mayoral race Mr. Sutton commissioned a poll which suggested that he was "on par or superior in public perception to other persons who were predicted to be candidates." (Tr. 46). As it turned out, Mr. Sutton's votes did in fact come from the primarily Black districts in the City, and he received few votes from white districts. Whether this was in whole or in part the result of a "self-fulfilling media prophesy," as he suggests, or evidence of racial bloc voting, is not capable of precise determination. However, Mr. Sutton's opinion is that had he not been isolated as the leader of a Black-only constituency, and had he been able to raise funds, he would have received many more votes from the larger audience he would have been able to reach.

Mr. Sutton also testified as to his opinion, in 1972, on the likely effect of the newly enacted run-off statute:

"A. My opinion was it was going to be in injuring minorities.

Q. In what way?

A. In every other office in New York State if there are five candidates, four candidates, three candidates running, a plurality is required to win the primary.

For the first time when this statute became law, only in New York City was there a requirement that there be a run-off, runoff for the offices of mayor, president of city council and comptroller, all citywide offices.

No such requirement [exists] for borough president, no such requirement [exists] anywhere else in the State of New York, so it looked to me that now what is going to happen, [since] the city is now becoming more and more populated by minorities. There is a thing called prejudice. Many of us are able to overcome it. But the persons who suffer most the prejudice, social, economic, political, were Hispanics and Blacks. Blacks and Hispanics were beginning to register to vote in larger numbers, consolidating their efforts in a voter registration campaign, and if a plurality was needed only, a possibility was there for winning a primary election and being the designee of the party.

If there was to be a runoff, one, it would be more difficult to raise money to run with a runoff when you are a member of a minority.

Secondly, you would in a runoff be pitted against one of those three or four, two or three other persons who were in the primary, and if people were to exercise their prejudices and it was to be exercised negatively, then you would lose the [run-off] election.

So I saw it as against the best interests of Hispanics and Blacks or minorities. And I spoke out to that effect." (Tr. 51–52).

Plaintiffs' third witness having a political career was Mr. Basil Paterson, who was elected to the State Senate in 1965 and who has held various appointive offices includ-

ing Deputy Mayor for the City of New York and Secretary of State for the State of New York. Mr. Paterson added factual corroboration to the testimony of Mr. Badillo and Mr. Sutton concerning the need for campaign funds to purchase television time for a short runoff primary campaign. His testimony in essence was that television and other forms of media coverage have replaced party organizational support as the most important factor in a citywide campaign. (Tr. 174–75).

In 1985 Mr. Paterson considered the possibility of running for the Democratic nomination for the office of Mayor. He estimated that it would cost approximately $2.2 million to conduct a "reasonable campaign", planning only on the basis of one primary and the general election. If a run-off primary were held, Mr. Paterson estimated that he would need an additional $.5 million. This estimate is reasonable.

Mr. Paterson discussed at length his opinions concerning the effect of the run-off primary law upon the candidacy of a minority member. He noted among other things that the history of run-off primaries or indeed any one on one election campaign conducted during a short period reveals that such a campaign is likely to be very intense, marked by a high emotional level experienced during the condensed period of time. Because insufficient time is allowed for debates or street electioneering or other traditional methods, the need for television time and the quick expenditure of large sums of money is overwhelming if a candidate is to prevail in the run-off. The short period of time allowed is insufficient to respond to new attacks on a candidate's qualifications, position or platform and therefore such a campaign lends itself to dirty tactics, assuming there is such a thing as Marquis of Queensberry rules in politics. Furthermore, he expressed a firm view that voters in a one to one run-off election following such a short intense campaign are more likely to vote on racial lines.

In 1970 Mr. Paterson won a contested Democratic primary election for Lieutenant Governor, receiving about 86% of the vote statewide. He won in 61 of the State's 62 counties. This points to the conclusion that Mr. Paterson received a large number of votes from white voters, a fact pertinent to our discussion for two reasons. First is the witness' explanation that in 1970 he had the support of almost every Democratic county leader in the State—a fact which contributed to his success in 1970 but which he believes would not be as significant a factor today, when party organization exerts much less influence over voting behavior. Second is the witness' differentiation of offices perceived by the public to be "top spots" as opposed to less authoritative, standby or administrative offices such as Lieutenant Governor. Mr. Paterson voiced a strong belief that voters who will vote for a qualified Black or minority candidate for the position of Lieutenant Governor will not vote for a Black candidate for Governor, because the Lieutenant Governor's position is "a spot that the public does not believe has any consequence." (Tr. 222). On the same reasoning, New York City voters will elect a minority candidate to the office of Borough President, as in the case of both Herman Badillo and Percy Sutton, but, according to Paterson, will not vote similarly in the Mayoral election. (Tr. 223).

Plaintiffs and defendants both produced expert witnesses who testified as to their conclusions based upon studies of voting behavior in New York City, and the effect of N.Y. Election Law § 6–162. Appearing first for plaintiffs was Dr. Richard Engstrom, Professor of Political Science at the University of New Orleans. Dr. Engstrom testified, as he has done in previous unrelated litigation concerning Section 2 of the Voting Rights Act, as to his conclusions based upon correlation and regression statistical analysis applied to three citywide elections in which a Black or Hispanic candidate appeared on the ballot. These elections were the 1977 Democratic mayoral primary, the 1982 Democratic primary for Lieutenant Governor, and the 1984 Democratic Presidential primary.[4] In his opin-

---

**4.** Dr. Engstrom's report (PX 7) and testimony      contain detailed descriptions of the method-

ion, voting patterns in these elections demonstrate a clear pattern of racially polarized voting.

Essentially, his conclusion that voting was racially polarized means that Black voters registered a clear preference for Black candidates, Hispanic voters registered a clear preference for Hispanic candidates, and non-Black, non-Hispanic voters (from the "homogenous" districts where over 90% of the voting age population was neither), gave the minority candidate almost no votes. Dr. Engstrom conducted his analysis by statistical comparison of two variables: (1) the racial composition of geographical units, the Assembly districts, and (2) the numbers of votes cast for a particular candidate in each assembly district. Using these measurements, Dr. Engstrom plotted charts summarizing the relationship between these two variables. The slope of the "regression line" drawn between the horizontal and vertical axis on each chart provides an estimate of the strength of the relationship between the racial or ethnic composition of the districts and the vote for minority candidates. In all three of the elections he studied, Dr. Engstrom found that as a precinct's minority population increased, so did the tendency for the minority candidate to garner more votes. For example, in the 1977 mayoral primary, Dr. Engstrom reported that Mr. Badillo received 79.2% of the Hispanic vote and Mr. Sutton received 72.4% of the Black vote, while neither of these candidates received over 2.4% of the votes cast in eight homogeneous, non-Black/non-Hispanic assembly districts. (Tr. at 252).

Plaintiffs' next expert witness, Dr. William O'Hare testified as a specialist in the academic fields of "demography research methodology, social psychology and urban sociology." (Tr. at 333). His testimony addressed the subject of how social and economic differences between whites and minorities in New York City are related to differences, if any, in levels of political participation. Dr. O'Hare's report (PX 8) offered evidence that Blacks and Hispanics in New York City generally have a lower socio-economic status than do Whites, and that groups having a lower socio-economic status register to vote and vote at lower rates than groups having higher socio-economic characteristics. The characteristics examined by Dr. O'Hare in determining such status were yearly family income, education and occupation. The data on which he relied were taken from the 1982 Current Population Survey conducted by the U.S. Census Bureau.

Not surprisingly perhaps, the tables in PX 8 reveal that Whites make up a proportionally higher percentage of the "white-collar" workers in New York City, and that persons in the higher income categories, also Whites, have completed more years of school than have Blacks or Hispanics. For example, 56.9% of the Hispanics in the sample had less than a high school education, compared to 36.8% of the Black respondents and only 30.5% of Whites. In the income category, 32.1% of Whites reported yearly incomes of $25,000 or more, whereas only 13.9% of Blacks and 11.1% of Hispanics belonged in this group.

The relationship between these statistics and levels of political participation shows that persons with higher incomes register to vote at higher rates than persons with lower incomes. Among those with a yearly income of less than $7,500, 46.9% of the sample said that they were registered, compared to 55.9% in the $7,500 to $14,999 category; 58% in the $15,000 to $24,999 category; and 67.7% among those with yearly incomes higher than $25,000. Similarly, a person who has completed more years of schooling is more likely to register to vote. The incidence of registration and

---

ology he employed and the proper interpretation of data using correlation and regression analysis, which would be too lengthy to repeat here. His report showed his method of adjusting for the problem of assembly districts having a substantial combined population of both Blacks and Hispanics (multivariate analysis).

His study also took into account the fact that the total minority population of any assembly district is larger than the voting age population. When adjustment was made to reflect voting age population only, Dr. Engstrom concluded that the degree of racial polarization in voting behavior became more pronounced.

voter turnout grows with each increase in educational level among the persons sampled:

| Years of school completed | Percent Registered | Percent of those registered who voted |
|---|---|---|
| Less than 12 years | 46.8 | 79.5 |
| 12 years/High School graduate | 57.2 | 85 |
| 13–15 years/some college | 66.1 | 87.3 |
| 16 years or more/college graduate | 74 | 87.6 |

It was an additional conclusion of Dr. O'Hare's study that race or ethnic background operates as an independent depressant on minority voter participation in New York City. As is illustrated in Tables 4.2 and 4.3 of his report (PX 8), if the difference in voter participation were solely due to income level, then Whites and Blacks in one income category would be expected to participate (register or register and vote) at approximately the same rates. However, Table 4.2 reports that even in the lower income brackets, Whites are more likely to register than are Blacks or Hispanics:

| Yearly Income | Blacks | Whites | Hispanics |
|---|---|---|---|
| Less than $7,500 | 43.3% | 58.7% | 31.9% |
| $7,500 to $14,999 | 48.0% | 64.0% | 49.9% |
| $15,000 to $24,999 | 60.6% | 61.6% | 43.8% |
| $25,000 or more | 73.9% | 71.2% | 52.1% |

While this tendency may be explained in part by the fact, for example, that the Black and Hispanic populations contain more persons who are under the voting age (Tr. 348), it is illustrative of the generally low rate of plaintiffs' participation and the resulting adverse impact of a majority vote requirement rather than a plurality system.

Plaintiffs' fifth expert witness was Dr. Stanley Aronowitz, Professor of Sociology at the Graduate Center of the City University of New York, who teaches courses on the subject of New York City politics.

Dr. Aronowitz' lengthy testimony described the recent history of New York City party politics from his own perception. In his opinion, the City was controlled under a tradition, dominant until about 1969, under which floating coalitions of special interest groups battled for political power. Floating coalitions existed because there have been no alliances of long standing based on race, class or identifiable ideological or economic considerations; rather, under specific circumstances various racial or ethnic voting blocs have shifted allegiances among various candidates. We agree with defendants' expert, Dr. Fuchs, that this tradition might be due in part to the pluralistic character of the New York City population, reflecting its position as a port of entry for various waves of immigrants during all of our history as a nation, and it may be due in part to the geographical and political structure of the boroughs which have tended to prevent overall city unity, subsequent to the arbitrary imposition of the merger of 1901 creating the greater City of New York as it now exists.

The modern era of City politics began with the election of reformer Fiorello LaGuardia to the office of Mayor in 1933. LaGuardia, a Republican running on a "Fusion" ticket, received the support of Blacks and Hispanics which he retained throughout his career as Mayor. His first election came about as a result of a series of outrageous scandals in municipal government which discredited the Democratic Party. His election resulted in replacing the political patronage system in City government which had supported Tammany Hall for more than a century. Mayor LaGuardia established a fusion coalition comprising the Republican Party in the City, independent business groups, so-called "good government" groups, and after 1937, a large portion of the labor movement.

In 1945 when Mayor LaGuardia declined to run for a fourth term, Blacks and Hispanics began to transfer their allegiance to

the Democratic Party, which succeeded in electing Mayor William O'Dwyer. He resigned under an aura of scandal, and was succeeded by Vincent Impelliteri, a Democrat, who defeated Justice Ferdinand Pecora, Democrat, and Edward Corsi, Republican in a special election in 1950, running on an independent "Experience Party" ticket. The special election was called too late to permit a primary, and party nominations were made by the County Committee.

The next strong successful citywide candidate was Mayor Robert F. Wagner, who served three terms from 1953 to 1965. In 1953 minority voters generally supported Wagner, but in the latter part of his career, Mayor Wagner came under heavy criticism from both the Black and Hispanic communities, for two reasons: dissatisfaction with housing relocations directed under the City's urban renewal program, and a mistaken perception that he favored the landlords during the massive rent strikes of 1963 and 1964 which took place in Harlem, East Harlem and Bedford Stuyvesant, all Black and Hispanic residential areas.

During the early part of the 1960's the Democratic Party suffered a deep split as a "reform" movement fought against the "regular" organization that had backed Mayor Wagner.

In 1965 John V. Lindsay, then a Republican and former Congressman from Manhattan's wealthy east side, was elected to the office of Mayor, defeating Democrat Abraham Beame and Conservative William F. Buckley. During his terms in office, Lindsay was successful in forming a new coalition of labor unions, minority groups and liberal or progressive business groups concerned with improving race relations. Lindsay's administration, coinciding with the national Civil Rights movement, and facing the problem of white flight away from the center city, chose to forge an alliance that supported a strong role for minorities in City government. In this he was successful, and the City was spared from the riots which affected other similar communities. By 1968, according to Dr. Aronowitz, "the regular political organizations in Manhattan ... are substantially weakened to the point where they can't really in most places any longer seriously contest for countywide political power." (Tr. 382).

While the Democratic machine was undergoing internecine warfare between the "regulars" and the "reformers," primarily a struggle for power rather than an ideological or philosophical difference, the Lindsay administration successfully captured the support of a coalition including the former "LaGuardia reformers"—those voters concerned with honest government, as well as the support of virtually all of the Black and Hispanic voters, many of whom had been able to achieve power under Lindsay's community control programs.

Dr. Aronowitz opined that the victory of Abraham Beame in the 1973 Democratic primary mentioned above, was the start of a more fiscally-conservative, less minority oriented, coalition dominated by real estate interests, which, he says, has continued to date. (Tr. 401).

After providing a historical background, Dr. Aronowitz described his study of the patterns of votes cast by different identifiable groups within the City. His method of discerning patterns, unlike that used in Dr. Engstrom's study, was a sampling technique whereby he chose samples of assembly districts having a predominately white population and districts having predominately Black or Hispanic populations, comparing the racial composition of sampled Assembly Districts with the election returns for those districts in three mayoral primary elections. In order to determine racial composition of an Assembly District, the witness used a report by the New York State Legislative Advisory Task Force on Reapportionment, which report analyzed the 1980 U.S. Census figures together with the City districting maps in use during 1982 and 1984. (PX 3(b) and 3(c)). He studied the election returns available from the Board of Elections to study the 1981 primary, and relied upon the election returns published in the New York Times following the informal count, for elections in 1973 and 1977. (Tr. 496–99). Thus the population break-down was not for precise-

ly the same years as the elections, and this study cannot be considered scientifically exact by any means. However, there were no large-scale relocations of any particular neighborhoods during these years, and Dr. Aronowitz based part of his observations and conclusions on personal experience. His opinions are entitled to some weight, since he has been both a student and a lecturer on the topic of New York's changing political scene for many years. He has been a Democratic party activist, the campaign manager for Mark Lane in 1962 and Martin Berger in 1964, and the founder and leader of certain local Democratic Clubs in the City. However, his testimony lacks the significance of an empirically based statistical analysis.

Relying upon his sample of various Assembly Districts in New York City, Dr. Aronowitz concluded that racial and ethnic issues have come to play a significant, if not dominant, role in the past three mayoral elections, and that the tendency for New York City Democrats to vote in racial blocs in clearly demonstrated by the past three mayoral primaries.

In the 1973 run-off primary election, this witness concluded that white voters voted along racial lines regardless of the ideological preferences they had displayed in the initial 1973 primary:

> "It did not matter that Beame was a traditional liberal, although not a reformer. The conservative vote that had united around [Mario] Biaggi transferred its loyalty to [Beame] because he was the white consensus candidate in a time when minorities were making a bid for independent political power, independent in the sense that they were prepared to run their own candidates." (PX 9 at 13–14).

The witness testified that racial bloc voting continued to appear in the 1977 and 1981 primaries for Mayor, evidenced by the Black districts voting for Mr. Sutton, the Hispanic districts voting for Mr. Badillo, and the failure of either of them to garner significant support in any of the White districts. For example, in each of the four Queens districts sampled, all four of the candidates other than Mr. Sutton and Mr. Badillo received "four digit" votes—the lowest being the 1401 votes cast for Ms. Absug in the 31st Assembly District. In contrast, neither Mr. Badillo nor Mr. Sutton received even close to 1,000 votes in any of these four districts. (PX 9).

Dr. Aronowitz' explanation of the reason behind racial bloc voting is essentially the same as other of plaintiffs' witnesses. Racial bloc voting occurred concurrently with an increase in community racial tensions; it increased when New York City suffered a fiscal crisis which was perceived, incorrectly, to have been caused by the expansive redistributive policies of the Lindsay administration. (Tr. 438). Also racial bloc voting increased as the regular Democratic organization lost control over voting behavior, so that it could no longer present a slate or balanced ticket with an appeal to all groups.

Testifying as defendants' expert was Dr. Esther Fuchs, Professor of Political Science at Barnard College of Columbia University. Dr. Fuchs' opinion on the run-off statute is that "the run-off statute does not discriminate against minorities in New York City, nor does it prevent them from equal access to voting and the nominating processes." (Tr. 628). Her report (DX 4) concludes that coalitions which cross racial and ethnic divisions have remained a standard feature of New York City politics, and that substantial "cross-over voting" has occurred in City elections where Black or Hispanic candidates opposed White candidates. As examples of this phenomenon, Dr. Fuchs points to the success of Blacks who have been elected Manhattan Borough Presidents, to Mr. Badillo's success, and to the minority candidates who have won elections as state court judges and Assembly members. This is correct; however, Dr. Fuchs' report does not differentiate between the three citywide offices regulated by § 6–162 and other elective offices in the State and City. We are persuaded by plaintiffs' evidence that voting for Mayor of the City of New York carries a different weight. Voters understandably perceive the office of Mayor as more visible and

authoritative than the offices listed by Dr. Fuchs as illustrations of minority officials who received votes from White voters. If White voters are reluctant to "cross-over" and vote for a minority candidate for Mayor, as the 1973 run-off election returns suggest, then § 6–162 enhances this tendency by increasing the effectiveness of negative racial campaign tactics during a short run-off campaign period.

Dr. Fuchs also testified that Black voters frequently have voted for White candidates, as evidenced by the Black vote for John Lindsay in 1969, for Edward Koch in the 1977 Mayoral run-off, for Mario Cuomo in 1982 (Governor), and for Elizabeth Hotzman in 1982 (Brooklyn District Attorney). While accurate, this testimony appears somewhat off the mark since the issue at trial was whether Black and Hispanic voters voting under the regulation of § 6–162 have less opportunity than other members of the electorate to participate in the nominating process and elect candidates of their choice. Once the 1977 run-off was set between two White candidates, it is of little consequence here that Black voters chose to vote for Mr. Koch. The question is whether § 6–162 decreased significantly the chance that a Black or Hispanic candidate could even advance to the run-off, and if such a candidate did advance, whether he or she could win a run-off election following a condensed campaign dependent upon media promotion.

Dr. Fuchs agreed with plaintiffs' experts that Blacks and Hispanics vote and register to vote at lower levels than Whites (DX 4 at 9), although Black and Hispanic enrollment, primarily within the Democratic Party, has grown during the past ten years. (Tr. 660–62). Dr. Fuchs testified that the legitimate rationale for the run-off statute is that the number and complexity of interest groups in the City, combined with the deterioration of the Democratic Party organization, make it difficult to nominate a candidate who is most representative of the majority of the population.

From her study of New York City elections over the past twenty years, Dr. Fuchs concluded that racial bloc voting does not occur in any identifiable trend. However,

she also testified that if racial bloc voting existed, the run-off statute would benefit the group having a population of 50% or more. (Tr. 712–14). *See infra* pp. 1554, 1555–1556.

*Voting Rights Act Claim*

Congress enacted the Voting Rights Act, 42 U.S.C. § 1971, *et seq.* in 1965 and revised it by amendment in 1976 and 1982. Section 2 of the Act creates a private right of action for citizens to challenge discriminatory voting practices. Significantly, the 1982 amendments revised Section 2 following vigorous Congressional debate concerning the standard of proof applicable to a voting discrimination case such as the one plaintiffs here have presented.

Originally, Section 2 stated in full that: "No voting qualification or prerequisite to voting, or standard, practice, or procedure shall be imposed or applied by any State or political subdivision to deny or abridge the right of any citizen of the United States to vote on account of race or color ...." 42 U.S.C. § 1973.

Section 2 as amended provides that: "(a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color, or in contravention of the guarantees set forth in section 4(f)(2), as provided in subsection (b).

(b) A violation of subsection (a) is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance

which may be considered: *Provided,* That nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population." Voting Rights Act Amendments of 1982. Pub.L. No. 97–205, § 3, 96 Stat. 131, 134 (codified at 42 U.S.C.A. § 1973 (West Supp. 1985).

The reason for the controversy surrounding the 1982 amendments is that in *Mobile v. Bolden,* 446 U.S. 55, 100 S.Ct. 1490, 64 L.Ed.2d 47 (1980), a plurality of the Supreme Court held that proof of a discriminatory *purpose* is required to establish both a statutory violation of Section 2 and a constitutional violation of the Fourteenth and Fifteenth Amendments. *Id.* at 60–74, 100 S.Ct. at 1495–1501. Before *Mobile v. Bolden,* the Supreme Court had suggested that proof of a constitutional violation could succeed upon a showing that a voting procedure or practice operated so as' to "minimize or cancel out" minority voting strength. *Fortson v. Dorsey,* 379 U.S. 433, 439, 85 S.Ct. 498, 501, 13 L.Ed.2d 401 (1965). A significant group of pre-*Bolden* decisions focused on the "invidious result" of an election scheme, or proof that the "effect" of the election practice was to deprive minority voters of equal access to the political process. *White v. Regester,* 412 U.S. 755, 93 S.Ct. 2332, 37 L.Ed.2d 314 (1973); *Whitcomb v. Chavis,* 403 U.S. 124, 91 S.Ct. 1858, 29 L.Ed.2d 363 (1971); *Burns v. Richardson,* 384 U.S. 73, 86 S.Ct. 1286, 16 L.Ed.2d 376 (1966), *Fortson v. Dorsey, supra; Zimmer v. McKeithen,* 485 F.2d 1297 (5th Cir.1973) (*en banc*), *aff'd on other grounds,* 424 U.S. 636, 96 S.Ct. 1083, 47 L.Ed.2d 296 (1976). Likewise, the few pre-*Bolden* decisions interpreting the Voting Rights Act standard of proof found that Section 2 reached voting practices which are discriminatory in effect, without requiring proof of discriminatory purpose. *E.g., Nevett v. Sides,* 571 F.2d 209, 237–38 (5th Cir.1978) (Wisdom, J. concurring); *Toney v. White,* 476 F.2d 203 (5th Cir.), *modified and aff'd,* 488 F.2d 310 (5th Cir.1973) (*en banc*).

With *Bolden,* a sharply divided Supreme Court rejected the "effects" test and dramatically altered the legal standard for proving a case premised on the theory of unlawful dilution of minority voting strength. *See generally,* McKenzie and Krauss, *Section 2 of the Voting Rights Act: An Analysis of the 1982 Amendment,* 19 Harvard Civ. Rights & Civ. Liberties L.Rev. 155 (1984); Parker, *The 'Results' Test of Section 2 of the Voting Rights Act: Abandoning the Intent Standard,* 69 Va.L.Rev. 715 (1983). Justice Stewart, writing for four members of the Court, equated the language of Section 2 with the language of the Fifteenth Amendment, which, in his view, incorporated a discriminatory purpose element of proof. The stringency of this new legal standard soon became apparent in cases where lower courts rejected challenges to at-large voting systems, because of insufficient evidence of discriminatory intent. *See Parker,* 69 Va.L.Rev. at 736 n. 108 and cases cited therein. According to one commentator, the consequence of *Bolden* was that "[d]ilution cases came to a virtual standstill; existing cases were overturned and dismissed, while plans for new cases were abandoned." Derfner, *Vote Dilution and the Voting Rights Act Amendments of 1982,* MINORITY VOTE .DILUTION (C. Davidson ed. 1984).

By a coincidence of timing, the Voting Rights Act came up for renewal shortly after the *Bolden* decision. Thus Congress accepted a fortuitous opportunity to overturn *Bolden,* and, in 1982 adopted a "results" test as the legal standard applicable to a challenge under Section 2 of the Voting Rights Act.

If ever there were an instance when Congress anticipated judicial inquiry into legislative intent and decided to supply it, this is the instance. The Senate Report, reprinted at 1982 U.S.Code Cong. & Admin.News 177, states that "the proposed amendment to Section 2 of the Voting Rights Act is designed to restore the legal standard that governed voting discrimination cases prior to the Supreme Court's decision in *Bolden.* In pre-*Bolden* cases plaintiffs could prevail by showing that a challenged election law or procedure, in the context of the total

circumstances of the local electoral process, had the result of denying a racial or language minority an equal chance to participate in the electoral process." *Id.* at 192–93. "The amendment to the language of Section 2 is designed to make clear that plaintiffs need not prove a discriminatory purpose in the adoption or maintenance of the challenged system or practice in order to establish a violation." *Id.* at 205.

This passage is only a small sample of the Report's extensive discussion of the relative merits of a "results" test as compared to a discriminatory purpose test. Opposition to the "results" standard was satisfied by the incorporation of the so-called "Dole compromise" which responded to fears that a litigant would be able to prove a Section 2 violation simply by showing an absence of proportional representation by minorities. That compromise is set forth in the latter portion of Section 2(b):

"The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered: *Provided,* That nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population."

In addition to setting forth a clear statement as to the standard of proof in a Section 2 case, the legislative history provides a list of "typical factors" which could supply probative evidence of a Section 2 violation. These factors are:

"1. the extent of any history of official discrimination in the state of political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process;

2. the extent to which voting in the elections of the state or political subdivision is racially polarized;

3. the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provision, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group;

4. if there is a candidate slating process, whether the members of the minority group have been denied access to that process;

5. the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process;

6. whether political campaigns have been characterized by overt or subtle racial appeals;

7. the extent to which members of the minority group have been elected to public office in the jurisdiction."

Additional factors that in some cases have had probative value as part of plaintiffs' evidence to establish a violation are:

"whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group; [and] whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous." 1982 U.S.Code Cong. & Admin. News, 206–07.

In considering the relevance of these "typical factors" to the case at bar, we are mindful of the fact that the statute itself directs the Court to consider the "totality of circumstances," and that the factors listed in the Senate Report are merely guidelines that may prove useful in the appropriate factual context. However, we also note that the factors listed by the Senate Report are drawn directly from the analytical framework of *White v. Regester,* the decision which supplied the statutory language enacted in the 1982 amendment of Section 2. Congress adopted the following language from *White:*

"The plaintiffs' burden is to produce evidence to support findings that the political processes leading to nomination and election were not equally open to participation by the group in question—that its members had less opportunity than did

other residents in the district to participate in the political processes and to elect legislators of their choice." 412 U.S. at 765–66, 93 S.Ct. at 2339 (citations omitted).

Therefore, we believe that the list of factors relied upon in *White* also is entitled to significant consideration. We now consider the foregoing factors.

### 1. *Past Discrimination*

Proof pertaining to this factor consisted primarily of plaintiffs' request that the Court take judicial notice of findings in prior cases on the subject of racial and ethnic discrimination in New York State. Contrary to the popularly held belief that racial discrimination only takes place within the Fifth and Eleventh Circuits, plaintiffs' exhibits 1, 12a, 12b, 12c, and 15 through 25 support the finding that Black and Hispanic voters in New York City have been the subject of various procedures and/or statutes in the recent past which have had the effect of abridging their voting rights.

Black citizens of New York were not eligible to vote on the same terms as White citizens until 1874 when the New York State Constitution was amended, following the ratification of the Fifteenth Amendment.

In 1921, Article II, § 1 of the New York State Constitution was amended to provide that "no person shall become entitled to vote ... unless such person is also able ... to read and write English." Forty-five years later, the United States Supreme Court ruled that this provision violated 42 U.S.C. § 1973b(e), and was void. *Katzenbach v. Morgan*, 384 U.S. 641, 86 S.Ct. 1717, 16 L.Ed.2d 828 (1966).

Following the *Katzenbach* decision, election officials in the counties of Bronx, Kings and in New York County continued to employ a literacy test.[5] *United Jewish Organizations of Williamsburgh v. Wilson*, 510 F.2d 512, 515 (2d Cir.1975), *aff'd*, 430 U.S. 144, 97 S.Ct. 996, 51 L.Ed.2d 229

(1977); *Torres v. Sachs*, 381 F.Supp. 309 (S.D.N.Y.1974); *New York v. United States*, 65 F.R.D. 10 (D.D.C.1974); *see also New York v. United States*, 419 U.S. 888, 95 S.Ct. 166, 42 L.Ed.2d 134 (1974), affirming district court order directing the State of New York on behalf of Bronx, Kings and New York Counties to comply with the filing requirements of 42 U.S.C. § 1973c. Judge Stewart of this Court found that the City of New York had conducted elections in English only, and that this practice, among others, deprived Hispanic voters of their statutory rights under the Voting Rights Act of 1965. *Torres*, 381 F.Supp. at 313.

■ The relatively recent employment of an English literacy test in New York City is evidence of past discrimination against Hispanic class members, and to some extent Black class members, which discrimination has an adverse impact on the ability of Black and Hispanic voters to participate effectively in the nominating process, *see Rogers v. Lodge*, 458 U.S. 613, 624, 102 S.Ct. 3272, 3279, 73 L.Ed.2d 1012 (1982) (approving district court's conclusion that a literacy test was one means by which Blacks had been denied access to the political process). On all the facts before this Court, plaintiffs have carried the burden of showing the existence of past discrimination. When this evidence is considered together with the fact that the 1982 Census reports 64.5% of Whites in New York City as registered voters, compared to only 53.1% of the Blacks sampled, and only 42.9% of Hispanic respondents (PX 8), we cannot say that past discrimination has no impact on the continued depressed rate of voter participation by members of the plaintiff class. On the contrary, historical evidence of past inequality when combined with evidence of lower socio-economic status and lower rates of voter registration, supports a finding that a plaintiff class member has less opportunity to nominate and elect a candidate of choice under a

---

5. Since the proof at trial shows that elections are now fought, won and lost in the media, rather than by the word of mouth campaigning of the past, literacy should seem to be a reason-

able condition for exercise of the franchise. However, the Supreme Court has held otherwise.

statute which requires a superplurality in the initial primary election (40%), or the burdens associated with running two primary campaigns.

### 2. Racial Appeals in Campaigning

As to this sixth factor listed in the Senate Report, the evidence overwhelmingly supports a finding that the 1973 run-off campaign featured negative, racially slanted campaign tactics, tactics which surfaced only following the initial primary and which carry enhanced effects during the two week run-off period. As discussed above, campaign literature was distributed containing overt and subtle appeals to racial prejudice. Two of these exhibits featured statements such as "Save New York City" or "Last Chance to Save New York City." As Mr. Badillo was asked during trial examination, the obvious question is "Save New York City from what?"

> "This is not just an appeal to vote the one fellow against the other. This is put on the basis of saving the City of New York. Saving it from what? Saving it from whom? Saving it from Hispanics and Blacks. That was the message that was used." (Tr. 99).

According to plaintiffs' tally, the racial appeals worked successfully to defeat Mr. Badillo's nomination, by causing a large turnout of White voters who had not participated in the initial primary, but were affected by last minute appeals to vote against the minority candidate:

> "It frightened the white community into coming out to vote in huge numbers for the June 26th [1973] primary, which they did, and that's the reason Abe Beame won by 61% to 39%." (Tr. 118).

> "[T]he newspapers were all astonished, nobody expected to have over 900,000 people coming out to vote in a New York City Democratic [run-off] primary. The total vote over 900,000 was a total shock to me, to all the experts who had not predicted that kind of turnout ... which has not been equaled since then." (Tr. 125–26).

The testimony and the documentary evidence persuade us that racial appeals were made; and, moreover, that they were made possible or gained strength due to existence of the short run-off period.

### 3. Racially polarized voting

■ A preponderance of the credible evidence satisfies this Court that, in citywide elections, voting patterns have been racially polarized to an extent made significant by the Voting Rights Act and its purpose. Defendants' expert pointed out that the data could not reveal the motives of any voter (Tr. 728–29), and we agree. However, for purposes of establishing a § 2 violation, it is significant if the evidence demonstrates bloc voting by one group or race for or against a minority candidate. In a vote dilution case such as this one, what is being challenged is the damper on *effective* participation by minorities in the population; and the pertinent case law recognizes that majority vote requirements, such as § 6–162, when combined with racial bloc voting, can result in diminished minority voting strength. *See City of Rome v. United States*, 446 U.S. 156, 183–84, 100 S.Ct. 1548, 1564–65, 64 L.Ed.2d 119 (1980) (disapproving election law change from plurality-win to majority vote/run-off system where Black candidate who won initial primary would still have to face runner-up White candidate in a racial bloc voting context); *Zimmer v. McKeithen*, 485 F.2d at 1305 (noting majority vote requirement is an "enhancing factor").

The evidence in this trial showed that the Black or Hispanic candidate in past citywide elections was on occasion unable to obtain votes from predominately White districts, although each received larger than majority support of the districts where there resided minority voters of the same race or ethnic background of the candidate. The evidence further demonstrated that in the one election year where a minority candidate appeared on the run-off slate, he lost overwhelmingly to a White candidate in an election unusual for its high voter turnout rate, and he received very few votes from those White Democrats who were ide-

ologically linked, as far as this can be determined by district, to his platform.

In the regression analysis applied to the 1977 election by Dr. Engstrom, the regression coefficients, or the estimate of how strongly the two variables (racial composition and votes cast for a particular candidate) are related, exceeded the level at which chance could be an explanation for the coincidence of the voter's and the candidate's racial characteristics. The regression coefficient, assigned the value "b" as representing this relationship, is set forth in columns B and D on the chart below. In each election analyzed, the regression coefficient evidences racially polarized voting patterns. Dr. Engstrom testified that any time the regression coefficient exceeds .5, there is no question but that racially polarized voting has occurred. "It means that at a minimum a majority of one group is voting against a majority of the other group." (Tr. 256). This appears to conform to the conclusions of experts in similar cases claiming a § 2 violation. *E.g.*, *Gingles v. Edminsten*, 590 F.Supp. 345, 368, n. 30 (E.D.N.C.1984).

Table 1: Results of Analysis Based on Population Percentages Within Assembly Districts

| | A | B | C | D | E | F |
|---|---|---|---|---|---|---|
| Minority Candidates | Intercept for Other Voters % | b for Hispanic Population (Relationship) | Intercept for Hispanic Voters % | b for Black Population (Relationship) | Intercept for Black Voters % | R2 |
| 1977 [Mayor] Badillo [Hispanic] | −3.4 | .709 (.056) | 67.5 | .067 (.033) | 3.3 | .746 |
| Sutton [Black] | −2.2 | .015 (.052) | −0.7 | .672 (.030) | 65.0 | .892 |
| 1982 [Lt.Gov.] McCall [Black] | 23.8 | .363 (.103) | 60.1 | .579 (.053) | 81.7 | .727 |
| 1984 [President] Jackson [Black] | 4.2 | .271 (.046) | 31.3 | .893 (.024) | 93.5 | .965 |

(PX 7)

As shown in column E, in all three elections Black voters voted overwhelmingly for Black candidates. For example, Mr. Sutton is estimated to have received 65% of the Black vote in 1977; Mr. McCall 81.7% in 1982; and the Rev. Jackson 93.5% in 1984. Black candidates fared less successfully with the Hispanic voters, who chose Walter Mondale over the Rev. Jackson in 1984 by 50.4% to 31.3%, (PX 7 at 12), although Mr. Badillo clearly won the Hispanic vote, 67.5%, in 1977.

Obviously, if the Black and Hispanic members of the plaintiff class were to combine as one coalition, they could elect a fusion candidate, but this had not heretofore been achieved in New York City, and is unlikely notwithstanding the tendency of the literature to lump them together as if they were a single bloc. *See* Tr. 552, 636, 639.

The evidence of polarization is revealed when column A, the "other voters" is compared to columns C and E. The "other voters," including Whites, demonstrated no significant support for either minority candidate in 1977 and only one quarter of their vote for Mr. McCall in the 1982 Lieutenant Governor primary election. The tendency for the vote to vary, depending on the type of voter residing in an Assembly district, is reflected in column F, ranging from 72.7% to 96.5%.

Dr. Aronowitz' testimony corroborated the opinion expressed by both Mr. Badillo and Dr. Engstrom. Dr. Aronowitz testified that the racial and ethnic breakdown of the vote in the 1973 run-off primary election shows that 80% of the Italian and Irish neighborhoods supported Mr. Beame, and 18% supported Mr. Badillo. Similarly, 76% of the voters in districts having a predominately Jewish population supported Mr. Beame while 24% supported Mr. Badillo. Black voters gave Mr. Badillo 62% of their vote and Mr. Beame 38%, while over 90% of the Hispanic voters voted for Mr. Badillo. (PX 14(j)). According to Dr. Aronowitz, the votes cast in the run-off were decidedly along racial rather than ideological lines because Mr. Beame picked up all ten of the Assembly Districts which had supported Mr. Biaggi, "a social conservative," in the initial primary, even though Mr. Beame ran on a traditional liberal platform. Dr. Aronowitz accounted for the fact that the more liberal Beame won the more conservative Biaggi districts because Mr. Beame was a White candidate running against a Hispanic candidate. (Tr. 421). This analysis appears to the Court to be correct.

We do not say, nor need we find, that racial bloc voting is total in New York City—it is not. In specific areas such as Congressional districts, White candidates, usually incumbents with a broad based appeal, have defeated Black and Hispanic opponents in instances of primary contests where minority voters were a majority. Further, it is of no consequence to the enforcement of the Voting Rights Act as to who caused the polarization. The exhibits show that polarization is less insofar as concerns Hispanic candidates and voters, and some of the polarization or bloc voting insofar as Black voters and candidates are concerned appears to stem from recent outrageous public utterances by certain Black political leaders which has inflamed both White and Black voters, e.g., Rev. Jackson and Rev. Farakhan. It is sufficient for our present analysis to find that racial and ethnic polarization and bloc voting exists in New York City to a significant degree, and I so find.

### 4. The Extent to which Minority Candidates Have Held Elective Offices.

In elections for offices other than city-wide offices, Blacks have been able to win White as well as Black votes. For example, in 1965 Constance Baker Motley won 87% of the total vote in a contested primary with a White candidate for the Democratic nomination as Manhattan Borough President; in 1969 Percy Sutton won 81% of the votes in such a primary for the same office; and there are other examples. See Appendix A to Defendants' Proposed Findings of Fact and Conclusions of Law, filed June 20, 1985. Blacks or Hispanics currently serve as representatives of 18 Assembly districts; New York has three Blacks and one Hispanic in the United States Congress; four Blacks and two Hispanics are New York State Senators; four Blacks and three Hispanics are members of the City Council; and there are 29 Black elected judges in New York City (Tr. 642–43). Despite this relative success in electing minority candidates to some offices, no Black or Hispanic candidate has been elected Mayor, Comptroller, or City Council President.

### 5. Tenuous State Policy.

In light of our finding, discussed below, that N.Y. Election Law § 6–162 violates the Fourteenth Amendment because it was designed with a discriminatory purpose, we also conclude that the state policy underlying § 6–162 is tenuous within the meaning of that term in the Senate Report on the Voting Rights Act amendments of 1982. The run-off primary was a marked departure from the traditional procedure used to select Party nominees. The statute applies to only one City, and in that one City to only three offices, and only to a primary, not a general election. The enactment of § 6–162 followed immediately upon an unprecedented showing by a Hispanic candidate for Mayor, and according to its legislative history, the state policy was, at least in part, aimed at preventing minority voters from gaining political power and/or preserving the status quo within the Democratic Party (Tr. 445, 668), neither of which

is a legitimate state concern. *See Republican Party v. Tashjian,* 599 F.Supp. 1228, 1239 (D.Conn.1984) (state's interest in fostering an informed electorate does not authorize state "to guage, much less determine, whether candidates for public office adequately reflect the views of their parties."), *aff'd.* 770 F.2d 265 (2d Cir. Aug. 8, 1985).

As to the final factor made relevant by the evidence at trial, the extent to which plaintiff class members bear the effects of discrimination in areas such as education, employment and health, testimony by plaintiffs' expert witness, Dr. O'Hare, as well as other testimony and statistical evidence demonstrated to the satisfaction of this Court that Black and Hispanic voters are largely concentrated in lower income groups and that they complete fewer years of schooling than do Whites in New York City. Whether this "hinder[s] their ability to participate effectively in the political process" (Senate Report, *supra*) is necessarily a speculative inquiry. Nevertheless, the facts show that poorer and less educated persons of voting age tend to register to vote and vote at low rates. The parties are not in dispute as to this specific fact. (*See* DX 11, Tr. 353). Thus, the burdens associated with campaigning and winning in two primaries instead of one are likely to have a disproportionately unfair impact on minority voters who, for some reason, already participate at lower rates than White eligible voters.

■ Based upon the totality of circumstances, plaintiffs have proved that § 6–162 violates Section 2 of the Voting Rights Act. We have conducted our analysis according to the suggested factors which aid in distinguishing between merely "losing the contest" and being deprived of political access and effective participation. There has been a failure of proof as to those other items listed as "typical factors" in the legislative history and not specifically considered. As already mentioned, nothing in this Court's decision is based upon the idea that minority voters are entitled to proportional representation in public office.

## Constitutional Claims

■ Plaintiffs' amended complaint alleges that § 6–162 violates the First, Thirteenth, Fourteenth and Fifteenth Amendments to the United States Constitution. Based on the evidence at trial, we find that there has been no denial of rights guaranteed to plaintiffs under the First or Thirteenth Amendments. However, in view of the evidence of discriminatory intent by the New York Legislature, and the thinly veiled purpose of the "anti-Badillo" law, we agree that plaintiffs have been deprived of the right to equal protection protected by the Fourteenth Amendment, in that § 6–162 was conceived as a purposeful device to further racial or ethnic discrimination and the statute had the result of diluting minority voting strength.

A constitutional challenge to § 6–162 based upon equal protection has been decided once by a New York State Court. In 1973 Mario Procaccino challenged the newly enacted statute, then N.Y. Election Law § 131–a, claiming that it violated both the Fourteenth Amendment's guarantees of due process and equal protection and the Home Rule provision of the New York State Constitution, Article IX, § 2(b). *Procaccino v. Board of Elections,* 73 Misc.2d 462, 341 N.Y.S.2d 810 (Sup.Ct.N.Y.Co. 1973).

The New York court discussed in detail the origins and purposes of New York's home rule law which, briefly, is designed to prevent undue legislative intrusion into local, municipal affairs. There was no Home Rule request before the enactment of the run-off primary statute. Nevertheless, the court in *Procaccino* upheld the statute, relying in part on the presumption of constitutionality attached to any legislative enactment. 341 N.Y.S.2d at 815. That court also found that the run-off statute clearly relates to a matter of state concern, and that the run-off procedure is part of the election process, a process traditionally regulated by the state legislature. Essentially, the court viewed the run-off statute as one of those matters of both state and local concern which are inseparably bound

together. *Id.* at 816. Under the controlling authority of *Adler v. Deegan,* 251 N.Y. 467, 167 N.E. 705 (1929), such matters of state concern may be dealt with by the Legislature without the necessity of a Home Rule request. *Id.* 341 N.Y.S.2d at 814.

In ruling on plaintiff's federal equal protection claim, the court in *Procaccino* built upon its reasoning supporting a finding that no Home Rule request was needed to conclude *a fortiori* that if the Home Rule provision does not prevent the enactment, then it cannot be found that the difference in application of the election law to different cities violates the Equal Protection clause.

"It has already been demonstrated herein that this enactment is a matter of state concern, is not arbitrary simply because it affects only New York City and has a rational basis, to wit, the implementation of 'effective local self-government'." To uphold plaintiff's contention that Election Law § 131–a violates the Equal Protection clause solely because it applies to New York City and not to all of New York State, would, as a logical consequence, render the home rule concept illusory. ... Equal protection only requires that a statute operate equally upon all members of the group provided the group is defined reasonably—reasonably being measured in terms of a proper legislative purpose." *Id.* at 819 (citations omitted).

Thus, having found that the run-off statute has a legitimate purpose, ("This enactment, it is hoped, will affirmatively implement the reality of representative government by reflecting a more valid consensus of the party members."), the Court found no violation of the constitutional right to equal protection or the right to vote.

Similarly, the New York court found that the run-off statute is a "rational process" and as such does not violate the right to due process, a right held by Mr. Procaccino in his capacity as a voter and as a candidate. The rational basis or legitimate purpose of the run-off law is "adjustment of the primary election process to better reflect the will of a majority or sizable plurality of voters." *Id.* at 816.

The United States Supreme Court has decided five major cases concerning the extent to which popular support type requirements may constitutionally be placed upon ballot access in the face of an equal protection challenge. *Anderson v. Celebrezze,* 460 U.S. 780, 103 S.Ct. 1564, 75 L.Ed.2d 547 (1983) (invalidating early filing deadline); *Illinois Board of Elections v. Socialist Workers Party,* 440 U.S. 173, 99 S.Ct. 983, 59 L.Ed.2d 230 (1979) (invalidating disparate signature requirements for city and state nominating petitions); *Lubin v. Panish,* 415 U.S. 709, 94 S.Ct. 1315, 39 L.Ed.2d 702 (1974) (invalidating candidate filing fee); *Jenness v. Fortson,* 403 U.S. 431, 91 S.Ct. 1970, 29 L.Ed.2d 554 (1971) (upholding signature requirement of 5% of votes cast in previous election for independent candidates to be placed on ballot); *Williams v. Rhodes,* 393 U.S. 23, 89 S.Ct. 5, 21 L.Ed.2d 24 (1968) (invalidating signature requirement of 15% of votes cast in previous election). However, in all of these cases, except *Lubin,* the statute challenged affected a newly formed or minor party or independent candidate. In the present case, plaintiffs are not part of an identifiable political organization such as the American Independent Party, the group whose candidate was blocked from the presidential ballot in *Williams,* nor are they situated as was John Anderson, an independent presidential candidate who was denied ballot access by the Ohio statute in *Celebrezze, supra.*

This situation is also unlike the one considered by the Supreme Court in *Illinois Board of Elections,* where Illinois law required independent candidates and new political parties to obtain more nominating signatures in elections for Chicago city offices than for statewide offices. There the disparate treatment was a clear restriction on the ability of the Socialist Workers Party to place a candidate on the city ballot. New York Election Law § 6–162 does not operate as such an obvious restriction on access to the ballot.

Section 6–162 on its face applies equally to all voters in New York City. It does not allocate unevenly the right to vote between White enrolled party members and Black or Hispanic enrolled party members. Nor have plaintiffs really alleged a deprivation due to treatment which differs between New York City and, for example, Buffalo, Rochester or Yonkers. Under general equal protection principles, articulated in the cases cited above, we would not find § 6–162 unconstitutional. However, this case is more specifically defined; this is a minority vote dilution case. Essentially plaintiffs' argument on constitutional equal protection grounds is the same as on their statutory claim—that Black and Hispanic voters in New York City are less able to participate in the nominating process than White voters in New York City. Under the most recently stated standards set by the U.S. Supreme Court, this argument can succeed as a constitutional equal protection claim if it is supported by adequate evidence that the invidious results of § 6–162, discussed above in our treatment of plaintiffs' statutory claim, can be traced to a racially discriminatory purpose. *Rogers v. Lodge,* 458 U.S. 613, 617, 102 S.Ct. 3272, 3275, 73 L.Ed.2d 1012 (1982); *Bolden,* 446 U.S. at 66, 100 S.Ct. at 1499. Such evidence is amply supplied by the legislative history of the run-off primary law.

*Legislative History*

With the experience of the 1969 Proccacino debacle fresh in the minds of the Democratic party organization, the New York City Run-off Primary Law was first introduced in the legislature late in the regular session of 1972. At that time John V. Lindsay, first elected as a Republican, was Mayor of New York, and a new mayorality election was scheduled to occur in the following year. Assemblymen Steingut and Blumenthal sponsored the act in the Assembly. Both were members of the regular party organization of the Democratic Party in New York City. We have mentioned, above, the activities of Assemblyman Steingut as the claimed inventor of the Stanleymobile. Apparently, there was no companion bill in the Senate but Senator

Bloom, also of New York, spoke for the bill in the debate in the Senate.

The bill jacket speaks volumes, both for what it says and what it does not say. The legislation moved with alacrity. Originally introduced March 7, 1972 and amended April 4th, it passed the Assembly at its third reading on April 14th, and it passed the Senate on April 25th. On May 8th it was sent to Governor Rockefeller, a Republican, who approved it on June 8th as Chapter 877 of the Laws of 1972.

The Honorable John P. Lomenzo, a Republican, and then Secretary of State wrote to the Counsel to the Governor under date of May 1, 1972 urging a veto. His prescient comments are of interest:

"1. This measure presents grave constitutional questions.

a. Out of the multiplicity of elective offices for which a primary election is held in New York City, only the aforementioned three offices are created a class for which a second election to choose party candidates may be held.

No reason for such special treatment is apparent nor does the measure advance any basis therefor.

b. None of the primary candidates for mayor, city council head and city comptroller, however denominated, of the other cities of this State are accorded such special treatment either.

Similarly, no rationale therefor is shown.

c. In no other primary contest for any office in the State is there a requirement that a candidate, to be successful, must garner not less than 40% of the votes cast.

Again, no justification for such classification is presented." (PX 1).

Mayor Lindsay wrote his friend Nelson Rockefeller under date of May 18, 1982 suggesting that "while I support the concept of a run-off primary, a substantial and unnecessary expenditure would be required of city funds." In addition the mayor raised other technical or logistic objections to the bill.

The Board of Elections also wrote to the Governor's Counsel objecting to the cost and logistic burdens. The letter of William F. Larkin, President of the New York City Board of Elections dated April 28, 1972 closes with the following comment:

"It is respectfully submitted that this Bill, standing alone without any other accommodating amendments being made to the Election Law, is absolutely ridiculous."

The Citizens Union of the City of New York, a public interest group, advised the Governor that it supported the Bill as did the Association of the Bar of the City of New York. The County Officers Association of the State of New York, consisting of county officials from only those counties *outside* of the City of New York, advised the Governor:

"The County Officer's Association does not want to interfere with the election process in the city but it is opposed to the principle established by this Bill. Elections of the one receiving the largest vote even though it may be only a small plurality has been the procedure and has worked for a long period of time. A change would not only seem to be unnecessary but would be expensive. For example, this Bill would cost the County of Monroe an additional $100,000 a year and all other counties outside the city a comparable amount. The County Officer's Association opposes the principle of this Bill.

Of course the Bill had specifically been drawn so as to exclude any reference to any upstate municipality or election district.

When the Bill came to the state Senate a transcript was made of the debate on the floor on April 23, 1972. This discussion is highly illuminating. It is apparent from the start that the Republican leadership in the Senate took the position that the Bill was solely a matter affecting the internal affairs of the City of New York, ("Home Rule"). This notwithstanding the fact that no Home Rule request had been received from the legislative body of that city, as ordinarily would be thought to be required under the New York Constitution, Article IX, § 2(b), discussed earlier.

Senator Brydges of Niagara County, New York was then the Republican Majority Leader. Senator Brydges stated that he favored the measure. His attitude is measured by his comment on the floor:

"[W]hen I view New York City when I visit it ... I am wondering whether it could be governed by either political party or by anybody of any race, color or creed .... Maybe [the political processes in the city] aren't going to work. They certainly aren't working now."

Various minority members of the Senate nailed this measure in debate, and eloquently. The resistance began with Senator Galiber of the Bronx, a Black Democrat:

"What we are talking about in this bill is vitiating. Vitiating the possibility of a minority [member] winning an election. And we are doing it again, because what we are saying is, we don't want, and I say it in all due respect, what about the Procaccino situation, and everybody jumps. It reminds me of the guy in the South who is against integration and says, well maybe I'll go that route. Would you want your daughter married to a Black man? He said no, I wouldn't want that. That is what we are doing. We are reacting here. This is a bad bill. Under this bill we are under the guise of liberalism, under the guise of democracy, a minority [member] could not win in the next 50 or 60 years in the City of New York, notwithstanding the fact that it represents a large portion. My liberal friends say to me as they pick those liberal credentials up, this represents reform. [If] this bill is passed there is not a slight possibility that a minority ..." [debate cut off—bill laid over] (DX 23).

Later, when debate was resumed, Senator Galiber charged the sponsors with "camouflage" as to their true motives. He said:

"What's really in issue is the fact that if this bill is passed, that ... as the trends are going and as people move to sub-

urbia ... that precludes the possibility [of] someone from the minority being elected .... What I am primarily concerned with is the fact that when we split this vote, when we have five or six persons who are running that it [the bill] precludes the possibility of a minority man winning, and all of you know it as well as I do. ... if the Republican Party ever wanted to singly destroy the Democratic Party, this is the bill. Interesting enough as usual, we are destroying ourselves in the guise of democracy ... its a bad bill."

Later, in the debate, Senator Stewart, also a Black Democrat, took the floor. He said:

"[I]t's really amusing. The more we learn we are told by the majority forces that all you have to do is behave yourself, and learn the process. You say blacks are powerless, and then you say— well the reason why blacks are powerless is you don't learn the rules of the games and you don't apply. So here we get to 1971–73 and blacks are beginning to learn the process in the City of New York, and I am tending to become more in tune with its youth, who say that this system will never work. It is so prone to oppress him, that if we ever learn one game, they are going to change the rules of the games. We have accepted the process as is, in the City of New York, it's real funny. Last month we announced in the City of New York that we are going to run one black man for city-wide office next year. Notice we didn't say which one. We didn't say it was for mayor or city council president or comptroller. We said we are going to run one black man for citywide office next year. We are learning the game well, not two black men, not three black men, not black men for all offices, we are going to run one black man for citywide office next year. We learned the game even better than that—we said that we were going to hold a black primary in October of this year—we are going to hold a black primary so that we end up with one black man that all black people in the City of New York can support for some

citywide office. Not necessarily for mayor, not necessarily for city council president, nor not necessarily for comptroller. We learned about balanced tickets—we learned that from the majority people, they used to have [a situation] where you had to have a [balanced ticket] ...."

\* \* \* \* \* \*

Again, but being very serious, I find it very tragic that now that black people in the City of New York have learned the rules of the game, now that we have spent all of last year, all of this year, and plan to spend the rest of this year registering black people to vote in the City of New York, you are going to change the rule of the game.

\* \* \* \* \* \*

There are at least five non-black, non-Puerto Rican, candidates running for mayor in the City of New York next year. Now that this is very possible, that with 30% combined black and Puerto Rican votes, we may nominate a black and Puerto Rican in this Democratic primary with five others splitting the vote. We come up with a bill saying that unless you get 40% of the vote, this figure that you pick is diabolic ... Why didn't you say 30% of the vote? You know— when 30% of the city is Black and Puerto Rican, why don't you give us a 50–50 chance and say 30% of the vote. No, you pick 40% which effectively precludes the Black and Puerto Rican coalition from nominating in a Democratic primary a candidate for mayor. And then you tell me, you give me two weeks, you say, O.K., the black and Puerto Rican candidate come in second, and you give me two weeks to reverse all of those coalitions that up to this date, never put a Black or a Puerto Rican on their balanced ticket. You give me two weeks to convince them—something that they haven't done for fifty years—two weeks to convince them that they should support the second candidate and have him win over the first candidate with five candidates who will not put any Blacks or

Puerto Ricans on their slate. Gentlemen, please don't do this to us because you have turned away our youth already, and as much as you may consider me a radical, my people say that I am conservative. My people say that I believe in this system, and I am fighting to participate in this system, but now that I am ready to participate, you change the rules of the game. I hope that this bill is defeated."

The record contains further discussion to the same effect, including observations about the cost to candidates, and to the City, of the extra run-off primary. But the bill passed the Senate 49 to 8.

The sponsors of the bill did not stand up to its assailants. Senator Bloom asserted that unless it were enacted "individuals would prevail in these primary contests who are not truly representative of the *majority* of the members of a particular party." (DX 23). This is another way of saying that, as this Court has concluded, the voting power of the minority would be diluted, for the power of a majority cannot be enhanced without taking away from that of a minority, and that minority might likely be racial or ethnic, rather than of a specific philosophical bent, *e.g.*, liberal or conservative. As polarized voting increases this likelihood becomes greater.

In articulating an evidentiary standard required for a finding of discriminatory intent, Justice Powell explained the circumstances which justify judicial review of legislative action:

"Rarely can it be said that a legislature or administrative body operating under a broad mandate made a decision motivated solely by a single concern, or even that a particular purpose was the 'dominant' or 'primary' one. In fact, it is because legislators and administrators are properly concerned with balancing numerous competing considerations that courts refrain from reviewing the merits of their decisions, absent a showing of arbitrariness or irrationality. But racial discrimination is not just another competing consideration. When there is a proof that a discriminatory purpose has been a motivating factor in the decision, this judicial deference is no longer justified. Determining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available. The impact of the official action—whether it 'bears more heavily on one race than another,' *Washington v. Davis, supra,* [426 U.S. 229] at 242 [96 S.Ct. 2040, 2048, 48 L.Ed.2d 597 (1976) ]—may provide an important starting point. Sometimes a clear pattern, unexplainable on grounds other than race, emerges from the effect of the state action even when the governing legislation appears neutral on its face. *Yick Wo v. Hopkins,* 118 U.S. 356 [6 S.Ct. 1064, 30 L.Ed. 220] (1886); *Guinn v. United States,* 238 U.S. 347 [35 S.Ct. 926, 59 L.Ed. 1340] (1915); *Lane v. Wilson,* 307 U.S. 268 [59 S.Ct. 872, 83 L.Ed. 1281] (1939); *Gomillion v. Lightfoot,* 364 U.S. 339 [81 S.Ct. 125, 5 L.Ed.2d 110] (1960). The evidentiary inquiry is then relatively ease. But such cases are rare. Absent a pattern as stark as that in *Gomillion* or *Yick Wo,* impact alone is not determinative, and the Court must look to other evidence [such as historical background].

*The legislative or administrative history may be highly relevant, especially where there are contemporary statements by members of the decisionmaking body, minutes of its meetings, or reports.* In some extraordinary instances the members might be called to the stand at trial to testify concerning the purpose of the official action, although even then such testimony frequently will be barred by privilege. See *Tenney v. Brandhove,* 341 U.S. 367 [71 S.Ct. 783, 95 L.Ed. 1019] (1951); *United States v. Nixon,* 418 U.S. 683, 705 [94 S.Ct. 3090, 3106, 41 L.Ed.2d 1039] (1974); 8 J. Wigmore, Evidence § 2371 (McNaughton rev. ed. 1961)." *Arlington Heights v. Metropolitan Housing Dev. Corp.,* 429 U.S. 252, 265–68, 97 S.Ct. 555, 563–65, 50 L.Ed.2d 450 (1977) (footnotes omitted, emphasis added).

Defendant's expert witness, Dr. Fuchs, conceded that "if we assume that the minority population of New York City is 50% or more in the near future" that it was "definitely possible that the run-off statute would benefit minority candidates" (Tr. 713). This analysis assumes bloc voting, and carries with it the implicit premise that while the minority population remains at or below 40%, the voting rights of the minority are diluted by the statute, as plaintiffs contend.

In a more difficult case than the one presented here we can imagine a real controversy over the means by which a plaintiff must prove that an election law was enacted or maintained for the purpose of racial discrimination. *See Jones v. City of Lubbock*, 727 F.2d 364, 377–78 (5th Cir. 1984). As Justice Stevens pointed out, a process by which a federal court inquires into the motivations of local officials presents a dangerous potential for intrusion into an area of intensely local and political concern. *Rogers v. Lodge, supra* 458 U.S. at 629, 102 S.Ct. at 3281 (Stevens, J. dissenting). The evidentiary inquiry is likely to be difficult because admissions of discriminatory intent are rare. However, in the case at bar we need not infer discriminatory intent merely from the circumstantial evidence of discriminatory impact, or from facts such as the absence of a Black or Hispanic in the Mayor's office. Instead, the legislative history of § 6–162, especially use of the "diabolic" 40% figure, supplies ample proof that satisfies the Supreme Court's equal protection test.

Under the most recently articulated standards set by the United States Supreme Court, the foregoing establishes a voting practice or procedure that was enacted with an unconstitutionally discriminatory purpose. In *Arlington Heights v. Metropolitan Housing Dev. Corp.*, 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977), the Court rejected the view that a law is invalid under equal protection simply because it may affect a greater proportion of one race than another. "Proof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause." *Id.* at 265, 97 S.Ct. at 563. In

*Bolden*, the Court's plurality opinion applied this rule in a vote dilution context, where an at-large electoral system was challenged. In *Rogers v. Lodge*, 458 U.S. at 624, 627, 102 S.Ct. at 3279, 3280, (another "at-large" election case), the Court followed *Bolden* and applied a discriminatory intent test, this time allowing for proof of intent to be proved by evidence of objective factors such as past discrimination and a depressed socio-economic status among Black voters.

In an analogous situation presented under § 5 of the Voting Rights Act, the Supreme Court agreed with the trial court that an electoral change from plurality-win to majority-win in general municipal elections, when combined with racial bloc voting, a majority White population, and an at-large electoral system, would dilute the voting strength of Black voters in a rural Georgia county. *City of Rome v. United States*, 446 U.S. 156, 183–84, 100 S.Ct. 1548, 1564–65, 64 L.Ed.2d 119 (1980). In explaining how the scheme would produce that effect, the findings of the District Court echoed the comments of Senator Stewart in the New York State Senate debate, just quoted:

"With respect to the majority vote and runoff election provisions, the discriminatory effect is clear beyond peradventure. Under the plurality-win system, a black candidate in Rome would stand a good chance of election if the white citizens split their votes among numerous candidates and the black voters engaged in 'single-shot' voting, *i.e.*, voted only for the candidate or candidates of their choice. Under the majority vote/runoff election scheme, however, the black candidate, even if he gained a plurality of votes in the general election, would still have to face the runner-up white candidate in a head-to-head runoff election in which, given bloc voting by race and a white majority, the black candidate would be at a severe disadvantage." *City of Rome*, 472 F.Supp. 221, 244 (D.D. C.1979) (footnotes omitted).

Turning to the alleged First Amendment violation, we recognize that "[t]he exclusion of candidates [from the ballot] also burdens voters' freedom of association, because an election campaign is an effective platform for the expression of views on the issues of the day, and a candidate serves as a rallying point for like-minded citizens." *Anderson v. Celebrezze,* 460 U.S. 780, 787–88, 103 S.Ct. 1564, 1569, 75 L.Ed.2d 547 (1983). We are also mindful that the Supreme Court has once tied the right of a candidate to a place on the ballot with the association rights of the voters themselves. *Lubin v. Panish,* 415 U.S. 709, 94 S.Ct. 1315, 39 L.Ed.2d 702 (1974). However, we find no First Amendment violation based upon the record in this case. Both *Anderson* and *Lubin* involved state statutes which totally excluded a plaintiff from appearing on a ballot.

In *Anderson,* Ohio law imposed an early filing deadline which effectively excluded a late-emerging independent Presidential candidate from the Ohio general election ballot. In *Lubin,* California law imposed a filing fee on an indigent candidate, leaving no alternative means for him to gain access to the ballot. Both of these statutes made it practically impossible for an identifiable segment of voters or political candidates to appear on the ballot. In neither case was the state able to demonstrate a legitimate justification for the rule.

In contrast, the New York run-off law has not been shown to eliminate completely any candidate from access to the ballot in the general election. Nothing in § 6–162 prevents plaintiff class members from nominating an independent candidate to run in the general election against the party nominee, or starting a new party of their own. Plaintiffs' rights to free association have not been abridged on account of § 6–162 as alleged.

Having found for plaintiffs on both the Voting Rights Act claim and the Constitutional claim to Equal Protection, we need not decide the alleged violation of the Fifteenth Amendment, this especially in light of the uncertainty surrounding the standard of proof applicable in a vote dilution case premised upon the Fifteenth Amendment's prohibition upon discriminatory interference with the right to vote. *See Rogers v. Lodge,* 458 U.S. at 619 n. 6, 102 S.Ct. at 3276 n. 6.

*Practical Effects*

This Court is not unmindful of the problems presented for a political party faced by a primary of the sort experienced in 1969 (five primary candidates) and 1977 (seven primary candidates), which in effect turns out to be a steeplechase race or a cavalry charge rather than a reasoned choice by the enrolled party members as to its candidate. The Procaccino experience, in which the 33% plurality candidate failed to reflect the mainstream of party support, and was therefore defeated in the general election notwithstanding a significant lead in party enrollment, does invite a remedy. The existing problem was best described by Dr. Fuchs, defendant's expert:

"New York is the most populous and most complex city in the state, and as it stands now, is still dominated by the Democratic Party. Because of the number of interest groups in the city, the complexity of the population, you want a situation within the party political process to be able to nominate a candidate which is most representative of the majority of that population. And the problem without the runoff is, because of the large number of candidates that we have now usually running in primaries, parties stand to be in a situation of nominating somebody [who] has a very small percentage of support among the party constituents.

THE COURT: Do you have an opinion as to why there are so many people running in the primary?

THE WITNESS: I think—my opinion on that would mostly be that politics is in some sense a game of ego now, and you do not need the support of party organizations to run anymore. And because parties don't control the process, individuals, some of whom have large egos, can get directly involved in the process now and run their own personal campaigns.

It is much easier to run an individual personal campaign now than it was when the party organization dominated the nominating process." (Tr. 707–08).

If, as this Court believes, Professor Fuchs is correct in her view that there is a serious problem of the nature she describes, presented by citywide primaries in which more than three candidates of equal strength are participating, then that problem could be met in ways which would not violate the federal Voting Rights Act or discriminate in practical effect against minorities, as this statute does. It may well be that a threshold of 30% or less to trigger a run-off would be non-discriminatory; such a conclusion is implicit in the plaintiffs' experts' reports and was recognized by Senator Stewart in the debate preceding adoption of the run-off primary law. (DX 23 at p. 13).

Furthermore, the efforts of those who would mount a big media campaign based on ego, and money, could be attenuated, and the organization of the political parties could be strengthened, if the New York Legislature so desires, by increasing, within reason, the percentage of party enrollment representing the required number of valid signatures to a nominating petition. As matters now stand, in this city of more than seven million people, a person can subject taxpayers to the cost of a contested primary by submitting only 10,000 valid signatures (or 5% of the party enrollment; if less). New York Election Law § 6–136(2)(a). Since it is a crime in New York to pay money to any person for procuring signatures to a nominating petition [*id.* § 17–122(4)] no nominating petition can be filed unless there is sufficient volunteer support in the community comprising party members willing to pack a petition and collect the necessary signatures thereon, as well as sufficient supporters to sign. Undoubtedly, other means to deal with the problem perceived by Professor Fuchs and this Court could be found. However, the run-off primary triggered at a level of less than 40% is not one of them, because in its effect, and by its intent, it discriminates against and dilutes the voting power of minority voters and adversely affects minority candidates.

*Conclusion*

For the reasons set forth above, plaintiffs are entitled to declaratory and injunctive relief as requested. A final judgment should be submitted on three (3) days notice (personal service) or on waiver of notice, which shall reserve jurisdiction to determine and award counsel fees for plaintiff.

Since the Court regards the issues as clear, and in light of the significant expense imposed on candidates, and on the City itself, by a run-off primary, it would seem inappropriate to stay the effect of the judgment pending appeal, assuming that the primary results in 1985 might invoke the statute. Defendants may be deemed to have moved in this Court for a stay pending appeal, and the motion is denied. See Rule 8, F.R.App.P.

So Ordered.