779 F.2d 141
 54 USLW 2335
 Reverend Calvin O. BUTTS, III and Digna Sanchez, on behalf
of themselves and all others similarly situated,
Plaintiffs-Appellees,
v.
CITY OF NEW YORK, New York City Board of Elections, Election
Commissioners Matteo Lumetta, Ferdinand C. Marchi, Rosemary
A. Millus, Joseph J. Previte, Martin Richards, James S.
Bass, Alice Sachs, Anthony Sadowski, Betty Dolen, Executive
Director, Robert S. Black, President, and Orlando Velez,
Secretary, Defendants-Appellants.
 No. 325, Docket 85-7670.
 United States Court of Appeals,
Second Circuit.
 Argued Sept. 17, 1985.
Decided Dec. 13, 1985.
 
 Randolph M. Scott-McLaughlin, New York City (Frank E. Deale, Juan Saavedra-Castro, Center for Constitutional Rights, New York City, of counsel), for plaintiffs-appellees.
 Thomas C. Crane, New York City (Frederick A.O. Schwarz, Jr., Corp. Counsel of City of New York, New York City, Frederick P. Schaffer, Beth G. Schwartz, Elizabeth J. Logan, of counsel), for defendants-appellants.
 Robert Abrams, Atty. Gen. State of N.Y., New York City (Robert Hermann, Sol. Gen., O. Peter Sherwood, Deputy Sol. Gen., Frederick K. Mehlman, Asst. Atty. General-in-Charge, Litigation Bureau, Colvin W. Grannum, Frederic L. Lieberman, James Cole, Asst. Attys. Gen., of counsel), filed a brief for amicus curiae State of N.Y.
 Alan Rothstein, New York City, filed a brief for amicus curiae Citizens Union of the City of New York.
 Lanie Guinier, Penda D. Hair, Maryann Walsh, New York City, filed a brief for amicus curiae NAACP Legal Defense and Educational Fund, Inc.
 Esmeralda Simmons, Emanuel A. Towns, Paul Wooten, Ann C. Northern, Brooklyn, N.Y., filed a brief for amicus curiae Metropolitan Black Bar Association, Inc.
 Robert Plautz, New York City, filed a brief for Intervenor Joseph R. Erazo, or in the alternative, amicus curiae.
 Before LUMBARD, OAKES and NEWMAN, Circuit Judges.
 LUMBARD, Circuit Judge:
 
 
 1
 The City of New York appeals from a judgment entered by Judge Brieant (S.D.N.Y.) following a bench trial, declaring that New York Election Law Sec. 6-162 violates both the Equal Protection Clause of the fourteenth amendment to the U.S. Constitution, and Section 2 of the Voting Rights Act, 42 U.S.C. Sec. 1973.[1] Judge Brieant's order permanently enjoined the City from giving effect to Sec. 6-162, more commonly known as the "primary run-off law." See 614 F.Supp. 1527, 1556. The City argues, first, that the district court clearly erred in finding that Sec. 6-162 was enacted with a racially discriminatory purpose; and that therefore there is no Equal Protection violation. Second, the City argues that the district court's finding of discriminatory effect sufficient to constitute a violation of the Voting Rights Act rests both on clearly erroneous factual findings, and on misapplication of legal standards. Because the record shows that the primary run-off law was never intended to deny minority voters--and does not have the effect of denying them--an equal opportunity to participate in the political process, we reverse.
 
 BACKGROUND
 
 2
 Political observers are agreed that the adoption of the run-off law was prompted by the unusual results of the 1969 New York City mayoral election. In the Democratic primary that year, two candidates--Herman Badillo and Robert Wagner--split the votes of the party's mainstream (Badillo receiving 28%, and Wagner 29%); as a result, the nomination went to Mario Proccacino (with 33% of the votes), who had run on a "safe streets" platform. Proccacino lost in the general election to incumbent John Lindsay, the nominee of the Independent and Liberal parties.
 
 
 3
 In 1972, Democratic State Assemblymen Stanley Steingut and Albert Blumenthal sponsored a primary run-off law. The run-off bill speedily passed the State Senate by a vote of 49-8, and the Assembly by a vote of 104-5. Governor Rockefeller subsequently signed it into law. As amended in 1976 and 1978, the law provides that if no candidate for the offices of Mayor, City Council President, or Comptroller of the City of New York receives 40% or more of the votes cast in a party's general primary, then the Board of Elections must conduct a run-off between the two top vote-getters in the general primary.[2]
 
 
 4
 Senator Bloom and other proponents of the bill argued that it was designed to avoid a repeat of the 1969 "fluke" Proccacino result, when a candidate who clearly did not represent the views of a majority of the members of his party secured the nomination because of the vicissitudes of vote division. The bill's few opponents in the Senate argued that it could have the effect of preventing blacks and Hispanics from ever electing their own candidates to the three city wide offices covered by Sec. 6-162. They argued, first, that the underlying motive for the law was the "Badillo scare" of 1969--that is, his garnering of 28% of the votes in the initial primary. Second, they pointed out that the 40% threshold figure was just above the percentage of black and Hispanic combined population in New York City at the time. Despite this criticism, and following strong rebuttal by the bill's proponents, the Senate passed it overwhelmingly. It is important to note that Senator Garcia--a leading Hispanic legislator and a Badillo supporter for the 1973 mayoralty--spoke in favor of Sec. 6-162 in the Senate debates, and claimed that then-Congressman Badillo supported the bill. Furthermore, the bill passed in the Assembly virtually without opposition, all five black and Hispanic Assemblymen present voting aye.
 
 
 5
 The original version of Sec. 6-162 survived constitutional challenge in Proccacino v. Board of Elections, 73 Misc.2d 462, 341 N.Y.S.2d 810 (Sup.Ct.N.Y.Co.1973). Proccacino argued that the law violated the "Home Rule" provision of the New York State Constitution (Art. IX, Sec. 2(b)), which allows municipalities to pass on State laws directed at the municipalities' "property, affairs, or government"; he also argued that the law violated the Due Process and Equal Protection Clauses of the fourteenth amendment to the U.S. Constitution. The court rejected the home rule claim on the ground that the state legislature had acted validly with regard to a matter of state concern. See 73 Misc.2d at 464-67, 341 N.Y.S.2d at 813-17 (citing Adler v. Deegan, 251 N.Y. 467, 167 N.E. 705 (1929)). As to the federal challenges, the court first rejected Proccacino's claim that Sec. 6-162 deprived him of his due process rights as a voter, holding that the law embodied a rational process aimed at better reflecting "a more valid consensus of the party members." 73 Misc.2d at 470, 341 N.Y.S.2d at 818. Second, the court rejected Proccacino's claim that, because it applied only to New York City, the law violated the Equal Protection clause. The court noted that the application to New York City alone was reasonable. See 73 Misc.2d at 470, 341 N.Y.S.2d at 818-19.
 
 
 6
 The run-off law has been triggered in three New York elections. In the 1973 mayoral race, the initial standings in the primary were:
 
 
 7
 Beame 34.5%
Badillo 29.0%
Biaggi 20.5%
Blumenthal 16.0%
 
 The run-off totals were:
 
 8
 Beame 61.0%
Badillo 39.0%
 
 
 9
 In 1977, seven candidates sought the Democratic mayoral nomination. The results of the initial primary were:
 
 
 10
 Koch 20.0%
Cuomo 19.0%
Beame 18.0%
Abzug 16.5%
Sutton 14.0%
Badillo 11.0%
Harnett 1.5%
 
 
 11
 Ed Koch defeated Mario Cuomo in the run-off, 55% to 45%. Also in 1977, five candidates sought the Democratic nomination for City Council President. The initial standings in the primary were:
 
 
 12
 O'Dwyer 31.0%
Bellamy 25.0%
Burden 20.0%
Hirschfeld 17.0%
Stavisky 7.0%
 
 
 13
 In the run-off, Carol Bellamy overtook incumbent Paul O'Dwyer, and won with 59% of the vote.
 
 
 14
 Plaintiffs Rev. Calvin Butts and Digna Sanchez, who represent a class consisting of all present and/or potentially eligible black and Hispanic voters residing in New York City, filed this action on October 15, 1984. On December 21, 1984, the Attorney General submitted a consent order dismissing the State and the Governor as defendants.[3] The City and the Board of Elections remain as defendants.
 
 
 15
 Judge Brieant presided over a bench trial from June 3 to June 10, 1985. To support their contention that Sec. 6-162 was intended to and does make it more difficult for a black or Hispanic candidate to receive a party's nomination, the plaintiffs offered the testimony of three leading minority political figures--Badillo, former Manhattan Borough President Percy Sutton, and former Lieutenant Governor Basil Paterson--and also the testimony of experts in the field of New York City politics. Defendants called their own expert witness, and offered extensive documentary evidence. On August 13, 1985, Judge Brieant found for the plaintiffs; subsequently, in a Final Order dated August 16, he enjoined the defendants from conducting any run-offs pursuant to Sec. 6-162. At the defendants' request, we expedited the appeal.
 
 
 16
 The district court first found for the plaintiffs on their claim under the Voting Rights Act. The court noted that Section 2 of the Act creates a private right of action for citizens to challenge allegedly discriminatory voting practices or procedures. Judge Brieant pointed out that intent is not a prerequisite to a Section 2 violation; instead, a plaintiff can prove a violation by demonstrating the existence of some combination of nine objective factors. In accordance with the Supreme Court's direction in Rogers v. Lodge, 458 U.S. 613, 102 S.Ct. 3272, 73 L.Ed.2d 1012 (1982), Judge Brieant focused his analysis on the "totality of circumstances," using the objective factors as a guide.
 
 
 17
 Crediting the plaintiffs' documentary evidence and their experts, the court found that the plaintiffs had met their burden of proof with respect to six of the nine typical objective factors. Judge Brieant stated that, in the "totality of circumstances," Sec. 6-162 diminishes minorities' ability to participate in the political process; he held, therefore, that the law violates Section 2. He went on to find, alternatively, that Sec. 6-162 violates the Equal Protection Clause because it was enacted with the purpose of diminishing minority participation in the political process. In making the latter finding, Judge Brieant relied upon the legislative history of Sec. 6-162, especially the statements of the few State Senators who spoke out against it in debate as a veiled attempt to ensure that minority candidates could never achieve citywide office in New York City. Judge Brieant argued that this view fit in with what he considered to be the "anti-Badillo" sentiment that had begun in 1969 and culminated in 1972, on the eve of the next mayoral race.
 
 DISCUSSION
 
 18
 Constitutional Claim --In order to hold that a law differentiates among races in violation of Equal Protection, the court must find that the law was passed--at least in part--with a racially discriminatory purpose. See, e.g., Rogers v. Lodge, supra, 458 U.S. at 617, 102 S.Ct. at 3275 (1982); Mobile v. Bolden, 446 U.S. 55, 66-67, 100 S.Ct. 1490, 1499, 64 L.Ed.2d 47 (1980). This finding requires a "sensitive inquiry into such circumstantial and direct evidence of intent as may be available." Arlington Heights v. Metropolitan Housing Devel. Corp., 429 U.S. 252, 266, 97 S.Ct. 555, 564, 50 L.Ed.2d 450 (1977). Because in Judge Brieant's view the legislative history of Sec. 6-162 supplied "ample" direct evidence of discriminatory intent, he did not base his finding of such intent on any circumstantial evidence or on the commonly-used objective factors outlined in Zimmer v. McKeithen, 485 F.2d 1297 (5th Cir.1973) (en banc), aff'd on other grounds, 424 U.S. 636, 96 S.Ct. 1083, 47 L.Ed.2d 296 (1976) (per curiam). The City of New York argues, and we agree, that the district court's finding of discriminatory intent was clearly erroneous.
 
 
 19
 Judge Brieant began his analysis by considering the circumstances surrounding the proposal of Sec. 6-162. Although he acknowledged that the bill may have been prompted in part by the Proccacino "debacle" of 1969, he concluded that it was mainly the result of the "Badillo scare" in the 1969 primary; he gave significant weight to Badillo's testimony that Sec. 6-162 was called the "anti-Badillo bill" in some circles. Noting that Assemblymen Steingut and Blumenthal had originally sponsored the run-off bill, Judge Brieant referred to a dirty trick that Steingut allegedly played on Badillo in the 1973 run-off campaign. Although he conceded that this testimony was the "rankest hearsay," he nevertheless used the story to impugn Steingut's motives in proposing Sec. 6-162. Finally, the district court erroneously stated that Steingut and Blumenthal both were "regular Democrats," implying that they sought to weaken the voices of reform in the party. In fact, Blumenthal was an independent Democrat who supported Badillo's mayoral candidacy in 1973.
 
 
 20
 Judge Brieant also placed great weight on memoranda written by concerned parties who opposed the bill, primarily on budgetary and logistical grounds. First, the court cited a letter written by then-Secretary of State John Lomenzo, who objected because of logistics and the home rule and fourteenth amendment problems that were later rejected in the case of Proccacino, supra. Second, the court cited then-Mayor Lindsay, who wrote that he supported the "concept" of a run-off, but criticized Sec. 6-162 as an unnecessary expenditure of city funds. Third, it cited both the New York City Board of Elections and the New York State County Officers Association, which objected because of cost and logistical burdens.
 
 
 21
 Judge Brieant conceded, on the other hand, that both the Citizens Union of the City of New York (a public-interest group) and the Association of the Bar of the City of New York had advised the Governor of their support for the bill. The court might also have noted that the media generally supported the bill. This support is demonstrated in part by several New York Times articles reproduced in the amicus brief of the State of New York. Thus, no clear conclusions can be derived from the public discussion of the run-off bill at the time; indeed, the district court's finding of discriminatory motive seems to rest primarily on statements made in the course of the Senate debate over Sec. 6-162.
 
 
 22
 Judge Brieant placed particular emphasis on the remarks of two black Senators, Galiber and Stewart. Senator Galiber argued that the run-off bill would prevent a minority candidate from winning a city-wide election through a plurality and, consequently, from ever winning such an office. Senator Stewart opposed the law on the same grounds, arguing that the run-off was bound to degenerate into a race-based choice, and would thus extinguish the possibility of a black/Hispanic coalition candidate winning by plurality. He added that, in his view, the 40% threshold had been chosen because the black and Hispanic combined population then comprised 30% of New York City, and thus the higher figure shielded the offices from a minority coalition candidate.
 
 
 23
 We find more persuasive the contrary evidence in the record provided by the remarks of the bill's proponents. First, responding to Senator Galiber, Senator Bloom stated that the purpose of the run-off was to bolster the weakening party system by ensuring that the candidate who emerged from the primary truly represented "the thinking of the majority." The court mistakenly characterized this statement as probative of racial motivation, interpreting the word "majority" to mean "racial majority." This is clearly not what Senator Bloom meant. His statements elsewhere in the debate clarify his view that the bill was not intended to and would not have the effect of weakening the voting power of racial--as opposed to ideological--minorities. Second, responding to Senator Stewart, Senator Brydges reiterated that the purpose of the bill was to ensure representation for the ideological majorities of political parties, and emphasized his opinion and hope that a minority candidate would one day profit from the run-off law.
 
 
 24
 The members of the Senate overwhelmingly passed the bill. The results in the Assembly--where the bill was virtually uncontested--were the same, with all 5 minority Assemblymen present voting in favor of the law. The district court, oddly, found this support probative of racial animus in light of the evidence before the legislature that the law would be costly and logistically difficult to implement. The district court made no mention of the support that the bill received from Senator Garcia (a Hispanic), and Garcia's statement during the debate that Badillo supported the bill, even though this evidence strongly undercuts the notion that Sec. 6-162 was intended as an "anti-Badillo" measure. The court cited the "alacrity" with which the bill moved through the Assembly and Senate (two months), and Governor Rockefeller's quick approval, as somehow probative of the discriminatory intent behind the bill.
 
 
 25
 It is a venerable principle that the legislature is presumed to act constitutionally. See, e.g., Borden's Farm Prods. Co. v. Baldwin, 293 U.S. 194, 209, 55 S.Ct. 187, 191, 79 L.Ed. 281 (1934); Thayer, The Origin and Scope of the American Doctrine of Constitutional Law, 7 Harv.L.Rev. 129, 135-42 (1893). This rule was recently reaffirmed in Mueller v. Allen, 463 U.S. 388, 103 S.Ct. 3062, 77 L.Ed.2d 721 (1983), where the Court noted that courts should be "reluctant to attribute unconstitutional motives to the state, particularly where a plausible [constitutional] purpose may be discovered from the face of the statute." Id. at 394-95, 103 S.Ct. at 3066. Despite this, in analyzing Sec. 6-162, the district court minimized evidence probative of the legitimacy of the law, and as a result drew all inferences against its constitutionality.
 
 
 26
 The events leading up to passage of the bill clearly support an inference of legitimate motive. The Proccacino nomination badly hurt the Democratic party in New York City, and such fluke results were likely to recur as the party system further deteriorated and a broader field of candidates emerged. The application of Sec. 6-162 solely to citywide offices in New York speaks primarily to the ideological diversity within the City and the importance of those offices. The 40% threshold, which Judge Brieant called "diabolic," was obviously chosen because Proccacino received 33% of the vote in 1969, not because of the minority population figures in New York. Finally, the speed with which the bill passed both houses demonstrates its broad-based support rather than any "nefarious" motives; this broad support is also evident from the strong minority legislative vote in favor of the bill.
 
 
 27
 At its core, the district court's holding seems to rest primarily on the statements, in debate, of the bill's opponents. The Supreme Court has, however, repeatedly cautioned--in the analogous context of statutory construction--against placing too much emphasis on the contemporaneous views of a bill's opponents. See, e.g., Ernst & Ernst v. Hochfelder, 425 U.S. 185, 204 n. 24, 96 S.Ct. 1375, 1386 n. 24, 47 L.Ed.2d 668 (1976); Schwegmann Bros. v. Calvert Distillers Corp., 341 U.S. 384, 394-95, 71 S.Ct. 745, 750-51, 95 L.Ed. 1035 (1951). Rather, "[i]t is the sponsors that we look to when the meaning of the statutory words is in doubt." Schwegmann Bros., 341 U.S. at 394-95, 71 S.Ct. at 750-51; see N.L.R.B. v. Fruit & Vegetable Packers, 377 U.S. 58, 66, 84 S.Ct. 1063, 1068, 12 L.Ed.2d 129 (1964). And, in fact, the legislative debates surrounding Sec. 6-162 are filled with lengthy speeches by the law's proponents attesting to its legitimate ideological purpose; there is not a single remark by any proponent of the legislation that so much as hints at any improper purpose. We conclude that the speculations and accusations of the run-off law's few opponents simply do not support an inference of the kind of racial animus discussed in, for example, Arlington Heights, supra, 429 U.S. at 265-68, 97 S.Ct. at 563-65.
 
 
 28
 Accordingly, we hold that the finding of discriminatory intent in the passage of Sec. 6-162 is clearly erroneous. New York City's run-off law does not violate the Equal Protection Clause.
 
 
 29
 Voting Rights Act Claim --The Voting Rights Act, as amended in 1982, provides that a violation of section 2 exists if
 
 
 30
 based on the totality of circumstances, it is shown that the political processes leading to nomination or election ... are not equally open to participation by members of a class of citizens protected by subsection (a) in that its members have less opportunity ... to participate in the political process and to elect representatives of their choice.... Provided, that nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.
 
 
 31
 42 U.S.C. Sec. 1973(b). The legislative history of the 1982 amendments sets forth a list of objective factors, derived from the decision in White v. Regester, 412 U.S. 755, 93 S.Ct. 2332, 37 L.Ed.2d 314 (1973), that is meant to aid courts in evaluating challenged laws. See S.Rep. No. 97-417, reprinted in 1982 U.S.Code Cong. & Ad.News 177, 207-08. Judge Brieant considered these factors and the case law interpreting them; he found that the plaintiffs had met their burden by demonstrating that Sec. 6-162 violated six of the factors, and therefore, in the "totality of circumstances", violated section 2 of the Act.
 
 
 32
 Our central disagreement with the district court's interpretation of the Voting Rights Act concerns the kind of electoral arrangements that can violate the Act. There are two basic ways in which members of a class of citizens may have "less opportunity ... to participate in the electoral process." There may either be restrictive practices that deter members of the class from voting, or electoral arrangements that diminish a class's opportunity to elect representatives in proportion to its numbers. Although the Act makes clear that a class has no right to elect its members by numerical proportion, the class does have a right to an opportunity, equal to that of other classes, to obtain such representation.
 
 
 33
 In the context of elections for multi-member bodies, equal opportunity can be denied in a variety of ways. It would clearly violate the Act for a jurisdiction to promote class-based malapportionment by creating electoral districts with smaller populations in areas with majority voters, and with larger populations in areas with minority voters. An only slightly more subtle violation would be class-based gerrymandering: diluting the voting power of a minority area by splitting it into two or more electoral districts. A less obvious device is the use of at-large elections instead of single-member districts, which may have the effect of denying areas with large concentrations of minority voters the opportunity to pool their strength and elect members of their class from such areas. See, e.g., City of Rome v. United States, 446 U.S. 156, 100 S.Ct. 1548, 64 L.Ed.2d 119 (1980); Regester, supra. A run-off requirement can exacerbate the unfair effect of at-large voting for a multi-member body, and has been invalidated in that context. See City of Rome, supra.
 
 
 34
 We cannot, however, take the concept of a class's impaired opportunity for equal representation and uncritically transfer it from the context of elections for multi-member bodies to that of elections for single-member offices. There can be no equal opportunity for representation within an office filled by one person. Whereas, in an election to a multi-member body, a minority class has an opportunity to secure a share of representation equal to that of other classes by electing its members from districts in which it is dominant, there is no such thing as a "share" of a single-member office. The distinction is implicit in City of Port Arthur v. United States, 459 U.S. 159, 103 S.Ct. 530, 74 L.Ed.2d 334 (1982), where the Court struck down a run-off requirement that Port Arthur had appended to its at-large voting system for seats on the multi-member city council, but made no mention of a similar run-off requirement for the election of mayor. The latter run-off was not even challenged.
 
 
 35
 Of course, it is possible to deny minority members an equal voice in filling a single-member office; this could occur, for example, if the office were chosen by a convention of delegates or a council of office-holders that had been selected on a basis that denied class members an equal opportunity to secure representation in the convention or council. But so long as the winner of an election for a single-member office is chosen directly by the votes of all eligible voters, it is unlikely that electoral arrangements for such an election can deny a class an equal opportunity for representation. We need not determine whether such opportunity could ever be denied in the context of an election to a single-member office. It suffices to rule in this case that a run-off election requirement in such an election does not deny any class an opportunity for equal representation and therefore cannot violate the Act. The rule in elections for single-member offices has always been that the candidate with the most votes wins, and nothing in the Act alters this basic political principle. Nor does the Act prevent any governmental unit from deciding that the winner must have not merely a plurality of the votes, but an absolute majority (as where run-offs are required when no candidate in the initial vote secures a majority) or at least a substantial plurality, such as the 40% level required by Sec. 6-162.
 
 
 36
 The plaintiffs contended explicitly at oral argument, and the district court appears to have implicitly assumed, that the Act condemns any electoral arrangement that makes it more difficult for a minority class to elect one of its members to office. That is not the standard for determining violations of the Act.[4] The point is illustrated by City of Richmond v. United States, 422 U.S. 358, 95 S.Ct. 2296, 45 L.Ed.2d 245 (1975), where annexation of white suburbs was held not to violate the Act, even though it made it more difficult for racial minorities to win elections.
 
 
 37
 Applying the proper standard for determining whether a voting procedure even requires an analysis under the Section 2 objective factors, we believe that Sec. 6-162 does not trigger such an analysis. First, the New York run-off law merely provides that the nominees for three City offices traditionally elected by a majority or large plurality actually represent the views of a majority or large plurality of their parties' voters. It is possible that the run-off law may make it harder for the preferred candidate of a racial minority--or an ideological minority--to win a party's nomination, but, as we have noted, the Act is concerned with the dilution of minority participation and not the difficulty of minority victory. See also City of Richmond, supra.
 
 
 38
 Second, in any event, the bill has not yet had any negative effect on a minority candidate; indeed, it is not at all clear which way the law will cut--it may help a minority candidate to win nomination.[5] The district court suggested that the added expense of a run-off would inevitably hurt minority candidates, who have more difficulty raising campaign funds. We note, however, that the run-off in the 1977 primary for City Council President allowed Carol Bellamy--who seemed something of an "outsider" at the time--to overtake incumbent Paul O'Dwyer. In sum, the district court's finding that the run-off law violates Section 2 of the Voting Rights Act cannot stand.
 
 
 39
 Although the district court's application of the "objective factors" test thus becomes immaterial, we feel compelled to note our view that some aspects of the court's conclusion are highly questionable.
 
 
 40
 Past Discrimination in Voting Rights --Judge Brieant found that past discrimination in New York voting had occurred to an extent made significant by Section 2 of the Act. We are not at all convinced that the slim proof on the issue of past discrimination in New York City will entitle it to much credit in the totality of circumstances. We also note the existence of mitigating factors that further diminish the force of this showing. Unlike many of the jurisdictions typically involved in Voting Rights Act cases, New York has ensured to black citizens the right to vote on the same terms as whites since 1874 (when the fifteenth amendment was ratified). Indeed, the City has taken affirmative steps since 1975 to encourage minority voting, including mail registration (N.Y. Election Law Sec. 5-210(1)) and a Registration Task Force appointed by Governor Cuomo.
 
 
 41
 Racial Appeals in Campaigning --Judge Brieant found that racial appeals had occurred in New York, citing various ads and flyers distributed during one election, the 1973 Beame-Badillo run-off. The source of this literature was and is unknown, however, and Beame denied any knowledge of it. Further, no evidence was shown of racial appeals in any other elections in which minorities were candidates, and the district court failed to note the absence of such evidence. See, e.g., Latino Political Action Committee v. City of Boston, 609 F.Supp. 739, 744-45 (D.Mass.1985) (considering lack of racial appeals). We believe that the isolated incident cited here may well be a slim reed upon which to rest a finding of significant racial appeals in campaigning.
 
 
 42
 The Extent to which Minority Candidates Have Held Elective Offices --Judge Brieant acknowledged that minorities have had considerable success in winning office in New York City, but dismissed these victories as relating to "lesser offices" and not to the three positions at issue in this case; consequently, he found that this Section 2 factor had also been proved. We are not at all sure that the district court was correct in its decision to disvalue the electoral success that minorities have had in New York City simply because these victories did not involve the City's three top offices. See, e.g., United States v. Marengo Cty. Comm., 731 F.2d 1546, 1572 (11th Cir.), cert. denied, --- U.S. ----, 105 S.Ct. 375, 83 L.Ed.2d 311 (1984) (considering evidence of electoral success in offices other than those at issue); NAACP v. Gadsden Cty. Sch. Bd., 691 F.2d 978, 983 (11th Cir.1982) (same). Indeed, this electoral success may well serve as a stark contrast to the jurisdictions involved in Marengo Cty. Comm., supra, and in Jones v. City of Lubbock, 727 F.2d 364, 368 (5th Cir.1984), in which minorities had had virtually no representatives elected, and were not likely to in the future.
 
 
 43
 Tenuous State Policy --The district court found that the state policy behind the run-off law is tenuous, and thus that plaintiffs met their burden of proof on this important Section 2 factor. The court's view primarily rested, however, on its finding that Sec. 6-162 was enacted with a discriminatory purpose. We have held that the judgment of discriminatory intent in the passage of the run-off bill is clearly erroneous, and we consequently believe that there is serious question as to the district court's finding of tenuous state policy. We would also note that Sec. 6-162, which was enacted with the motive of improving the workings of the party system in New York, appears quite distinguishable from the cases in which constituencies have suddenly adopted truly tenuous revisions to their traditional voting practices with no plausible motive other than to disenfranchise racial minorities. See, e.g., City of Rome, supra; Marengo Cty., supra.
 
 
 44
 Effects of Discrimination in Other Areas --The legislative history of the amendments to Section 2 also suggests that courts consider whether minorities have traditionally been discriminated against in the areas of education, employment, and health, and whether those effects linger to the detriment of minority registration and voting. Judge Brieant noted the testimony to the effect that racial minorities have a lower socioeconomic status than whites in New York City, and that persons of such status tend to register and to vote less. Judge Brieant appears not to have included this factor in the overall totality analysis, and this is of course proper in the absence of any showing that the City has in any way caused these conditions through official discrimination.
 
 CONCLUSION
 
 45
 Because we believe that the district court clearly erred in finding that the enactment of the run-off law was motivated by racial discrimination, we reverse the judgment that Sec. 6-162 violates the Equal Protection Clause. We also reverse the judgment that the run-off law violates Section 2 of the Voting Rights Act. In our view, the Act is directed at procedures that deny racial minorities a fair opportunity to participate in the electoral process, and not at those that may have the result of reducing the likelihood that a minority will elect its preferred candidate to a single-member office. Consequently, Sec. 6-162 does not have the effects that are proscribed by Section 2; indeed, is not yet clear whether the law will diminish the voting power of racial minorities in New York City. Finally, even if the objective factors test were to be applied, we note that we have serious doubts regarding the district court's finding that the run-off law violates Section 2 when considered in the totality of circumstances.
 
 
 46
 The judgment is reversed with direction to dismiss the complaint.
 
 OAKES, Circuit Judge (dissenting):
 
 47
 I would not reach the question whether New York Election Law Sec. 6-162 (1978), the primary run-off law, violated the Fourteenth or Fifteenth Amendments (although I have trouble with the district court's finding that the law was enacted for discriminatory purposes under Rogers v. Lodge, 458 U.S. 613, 102 S.Ct. 3272, 73 L.Ed.2d 1012 (1982)), because I believe that the district court properly found that the law does have a discriminatory effect so as to violate section 2 of the Voting Rights Act, 42 U.S.C. Sec. 1973 (1982).
 
 
 48
 In 1982 Congress added subsection (b) to section 2 of the Voting Rights Act to make explicit that section 2 could be violated by a showing of discriminatory effect as well as intent. As amended, section 2 reads as follows:
 
 
 49
 (a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color, or in contravention of the guarantees set forth in section 1973b(f)(2) of this title, as provided in subsection (b) of this section.
 
 
 50
 (b) A violation of subsection (a) of this section is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) of this section in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered: Provided, That nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.
 
 
 51
 The statute thus frames the question for us as whether "based on the totality of circumstances" the primary run-off law causes a race- or color-based class of voters to "have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." As the majority opinion correctly points out, at n. 5, it is the anticipated effect of the law with which we are concerned, see Gingles v. Edmisten, 590 F.Supp. 345, 363 (E.D.N.C.1984), prob. juris. noted sub nom. Thornburg v. Gingles, --- U.S. ----, 105 S.Ct. 2137, 85 L.Ed.2d 495 (1985), since discriminatory voting laws, by their very adoption, may affect minority political participation in subtle ways, e.g., by deterring minority candidates from seeking office.
 
 
 52
 The courts may consider as one circumstance the extent to which members of a protected class have been elected to the office(s) affected by the primary run-off law, and I note that no minority candidate has been elected to any of the three offices so affected (mayor, city council president, comptroller). While the law establishes no right to have members of a protected class elected in numbers equal to their proportion in the population, no one contends for such a right here. The legislative history of the 1982 amendment to section 2 spells out seven additional criteria or factors derived from White v. Regester, 412 U.S. 755, 93 S.Ct. 2332, 37 L.Ed.2d 314 (1973), which we may look to in making our overall determination:
 
 
 53
 1. the extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process;
 
 
 54
 2. the extent to which voting in the elections of the state or political subdivision is racially polarized;
 
 
 55
 3. the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group;
 
 
 56
 4. if there is a candidate slating process, whether the members of the minority group have been denied access to that process;
 
 
 57
 5. the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process;
 
 
 58
 6. whether political campaigns have been characterized by overt or subtle racial appeals;
 
 
 59
 7. the extent to which members of the minority group have been elected to public office in the jurisdiction [mentioned specifically in the statute].
 
 
 60
 S.Rep. No. 417, 97th Cong., 2d Sess. 28-29, reprinted in 1982 U.S.Code Cong. & Ad.News 177, 206-07 (footnotes omitted).
 
 
 61
 Two additional factors mentioned in the Senate Report are:
 
 
 62
 whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group.
 
 
 63
 whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous.
 
 
 64
 Id. at 29, 1982 U.S.Code Cong. & Ad.News at 207 (footnotes omitted).
 
 
 65
 Judge Brieant, recognizing that it is the "totality of circumstances" that must be examined, and that the nine factors mentioned in the Senate Report are only "guidelines," 614 F.Supp. 1527, 1543 (S.D.N.Y.1985), relied on the following factors mentioned in that report: (1)--history of past discrimination; (6)--racial appeals in campaigning; (2)--racially polarized voting; (7)--the extent to which candidates have held elective offices, particularly the offices affected by the law in question; and the "tenuous[ness]" of state policy. To a lesser, and more speculative, extent he relied also on factor (5). I think the district judge's findings as to these points, set forth at 614 F.Supp. at 1544-48, speak for themselves, are supported by the evidence, and cannot be deemed clearly erroneous. I incorporate them by reference in this opinion.
 
 
 66
 The majority opinion discusses these findings so as to cast doubt on their validity. Its reference to past discrimination, however, does not take into account some of the litigation in this court, see, e.g., United Jewish Organizations v. Wilson, 510 F.2d 512, 516-17 (2d Cir.1975) (1972 redistricting in Bronx, Kings, and New York Counties running afoul of section 5 of the Voting Rights Act), aff'd sub nom. United Jewish Organizations v. Carey, 430 U.S. 144, 97 S.Ct. 996, 51 L.Ed.2d 229 (1977). It also fails to demonstrate that Judge Brieant was clearly in error in finding that
 
 
 67
 historical evidence of past inequality when combined with evidence of lower socio-economic status and lower rates of voter registration, supports a finding that a plaintiff class member has less opportunity to nominate and elect a candidate of choice under a statute which requires a superplurality in the initial primary election (40%), or the burdens associated with running two primary campaigns.
 
 
 68
 614 F.Supp. at 1544-45 (factor 5 above referred to).
 
 
 69
 It is true that Judge Brieant's reference to racial appeals in campaigning, 614 F.Supp. at 1545, referred only to the 1973 primary, but that was the only run-off primary involving a minority candidate for one of the three offices in question. Judge Brieant found "overwhelming[ ]" evidence that such appeals were made. Id. The majority opinion does not explain why the fact that these appeals could not be directly attributed to the minority candidate's opponent should be of relevance. The important inquiry, as the trial court found, was that the racial appeals were made and "were made possible or gained strength due to existence of the short run-off period [of three weeks]." Id. The majority opinion does not mention this factual finding.
 
 
 70
 Judge Brieant's findings of racially polarized voting, 614 F.Supp. at 1545-47, based as they are in substantial part on statistical regression analysis, which is the standard method of analysis of racially polarized voting, NAACP v. Gadsden County School Board, 691 F.2d 978, 983 (11th Cir.1982); Gingles, 590 F.Supp. at 367 n. 29, are not mentioned, let alone challenged, in the majority opinion.[1] All that is necessary is that racial and ethnic polarization and bloc voting exist to a significant degree; Judge Brieant so found, 614 F.Supp. at 1547. Any insistence on more comprehensive and extensive statistical evidence on prior elections for the offices at issue to prove racial bloc voting would effectively insulate voting schemes until the requisite number of elections had occurred in which there had been minority candidates and in which sufficient information was available upon which to base a valid statistical analysis. In this case there were three mayoral elections in the thirteen years between the passage of Sec. 6-162 and Judge Brieant's decision. While regression analysis was performed only for the 1977 mayoral election, according to Dr. Engstrom's testimony, the information upon which to base a regression analysis was not available for 1973. In 1981 no minority candidate ran for mayor.
 
 
 71
 Judge Brieant recognized that minorities have had considerable electoral success in New York in non-city-wide contests. He balanced this against the striking fact that no minority candidate has been elected to an office where the law requires a run-off primary. In the absence of any minority success for the three offices in which this unique intermediate hurdle exists, the majority's discussion of this finding--highlighting that "minorities have had considerable electoral success in New York City"--seems to me beside the point.
 
 
 72
 As to the tenuousness of the state policy found by Judge Brieant, the majority opinion refers principally to the trial judge's reliance on discriminatory purpose. Even if one accepts that the run-off law was enacted with the most beneficent of purposes, however, it has a certain tenuousness. It applies to only one city in New York. It applies to only three offices, and then only to the party primary, not the general election, so that while a party's nominee must garner at least 40% of the party vote (or 50% in case of a run-off), he could become mayor with a significantly lower percentage of support. Finally, New York City is the only one of the seventeen largest cities in the United States with minority populations large enough to support a black or Hispanic mayoral candidacy, but not so large as fully to dominate the political scene, that has a run-off primary (as opposed to a run-off election used in twelve of such cities).[2] I think it proper to consider the uniqueness or limited scope of an election law in determining "tenuousness," and under this standard New York's primary run-off law may properly be considered tenuous.
 
 
 73
 Because Judge Brieant's factual findings are not clearly erroneous, I am obliged to approach the section 2 question from the factual premises of the district judge, a position which I apparently do not share with the majority. So approaching it, I face the interesting and difficult question posed by the majority: does the Voting Rights Act apply only to at-large elections or elections for multi-member bodies, and not to elections for single-member offices, or can there be "less opportunity ... to participate in the political process" when that process involves an election for a single-member office? With certain qualifications (such as the case of an office filled by a convention) not relevant here, the majority asserts that there cannot be less opportunity where there is a single-member office, because "[t]here can be no equal opportunity for representation within an office filled by one person."
 
 
 74
 I believe the majority misses the point of the 1982 amendments to the Voting Rights Act. The Senate Report states,
 
 
 75
 As the Supreme Court has repeatedly noted, discriminatory election systems or practices which operate, designedly or otherwise, to minimize or cancel out the voting strength and political effectiveness of minority groups, are an impermissible denial of the right to have one's vote fully count, just as much as outright denial of access to the ballot box.
 
 
 76
 S.Rep. No. 417, supra, at 28, 1982 U.S.Code Cong. & Ad.News at 205 (footnote omitted) (emphasis added).
 
 
 77
 The requirement that the political processes leading to nomination and election be "equally open to participation by the group in question" extends beyond formal or official bars to registering and voting, or to maintaining a candidacy.
 
 
 78
 As the Court said in White, the question whether the political processes are "equally open" depends upon a searching practical evaluation of the "past and present reality."
 
 
 79
 Id. at 30, 1982 U.S.Code Cong. & Ad.News at 208 (footnote omitted) (emphasis added). The majority focuses on minority opportunity for "representation," but ignores the statute's and legislative history's emphasis on opportunity to "participate." There is simply nothing in the Act or the legislative history that would indicate a congressional intent to protect from scrutiny single-member office election laws, particularly when they contain unique provisions such as a party primary run-off, that may deny minorities an opportunity to participate equally. See id., 1982 U.S.Code Cong. & Ad.News at 207.
 
 
 80
 It is true that blacks and Hispanics have no right under the Act to a proportionate "share" of the offices of mayor, comptroller, or city council president. But they do have a right not to be subject to any structural process that under the totality of circumstances deprives them of equal opportunity to field a candidate for one of those offices. It is my view, as I believe it was the view of the district judge, that the run-off primary is such a process, because a run-off primary after an initial closed primary, followed by a general election, inevitably discriminates against minority voters in New York, even though I think a run-off election after an open primary, or a general election after a party primary, does not involve any more discrimination than is inherent in the size of the voting group, per the majority's reasoning here.
 
 
 81
 By virtue of a run-off after a closed primary election, a bloc-voting white majority in what is for all practical purposes a one-party city such as the City of New York can keep a minority candidate off the ballot for the general election. Such a candidate has three hurdles to leap in order to win election--he must be among the top two finishers in the initial party primary (bloc voting would likely prevent him from reaching the 40% threshold that would enable him to avoid a run-off),[3] he must win the run-off primary if he has not won 40% of the vote, and he must then win the general election. In the more usual case of a run-off election after an open non-party primary, there are only two hurdles to be jumped and a number of minority candidates in cities which have such a system have won election. As to New York City, we can easily hypothesize a scenario in which in a two-step election a non-white candidate wins a plurality in the Democratic primary and then attracts a sufficient number of the overwhelmingly Democratic electorate to defeat a white Republican rival for the mayoralty. Because of the third hurdle of a run-off in a closed primary--perhaps because of the brevity of time involved, the expense such a run-off involves, or the dynamics of a closed primary run-off, which the testimony showed tend to encourage racial polarization, or perhaps because of all three factors--the minority candidate is disadvantaged. In my opinion, such a disadvantage in a racial-bloc voting city already subject to the preclearance provisions of the Voting Rights Act, as New York is, is a violation of section 2 of the Act. Moreover, the run-off effectively converts the closed primary into a majority vote system. Although not a per se violation of the Act, majority vote requirements have been criticized in at-large systems for submerging racial minorities. See City of Rome v. United States, 446 U.S. 156, 183-84, 100 S.Ct. 1548, 1564-65, 64 L.Ed.2d 119 (1980); Zimmer v. McKeithen, 485 F.2d 1297, 1306 (5th Cir.1973) (en banc), aff'd on other grounds sub nom. East Carroll Parish School Board v. Marshall, 424 U.S. 636, 96 S.Ct. 1083, 47 L.Ed.2d 296 (1976).
 
 
 82
 The district court found, at least implicitly, that each of the three factors flowing from a closed primary run-off affects minority political participation. Under New York Election Law Sec. 8-100(1)(b) the run-off must be held within two weeks of the initial primary election. The time constraints require that the run-off campaign concentrate heavily on the media, which in turn significantly enhances the importance of campaign funding. See 614 F.Supp. at 1530-31, 1533, 1536. This need for funds in turn disadvantages minority candidates because they often lack access to large amounts of campaign funds. Id. at 1533. The dynamics of a run-off primary also exacerbate racial polarization. Id. at 1531-33. The district court apparently agreed with the opinions expressed by Basil Paterson, an elected State Senator and Lieutenant Governor and appointed Deputy Mayor of the City of New York and Secretary of State for the State of New York. Mr. Paterson's testimony was summarized as follows by the district court:
 
 
 83
 Mr. Paterson added factual corroboration to the testimony of Mr. Badillo and Mr. Sutton concerning the need for campaign funds to purchase television time for a short runoff primary campaign. His testimony in essence was that television and other forms of media coverage have replaced party organizational support as the most important factor in a citywide campaign. (Tr. 174-75).
 
 
 84
 In 1985 Mr. Paterson considered the possibility of running for the Democratic nomination for the office of Mayor. He estimated that it would cost approximately $2.2 million to conduct a "reasonable campaign", planning only on the basis of one primary and the general election. If a run-off primary were held, Mr. Paterson estimated that he would need an additional $.5 million. This estimate is reasonable.
 
 
 85
 Mr. Paterson discussed at length his opinions concerning the effect of the run-off primary law upon the candidacy of a minority member. He noted among other things that the history of run-off primaries or indeed any one on one election campaign conducted during a short period reveals that such a campaign is likely to be very intense, marked by a high emotional level experienced during the condensed period of time. Because insufficient time is allowed for debates or street electioneering or other traditional methods, the need for television time and the quick expenditure of large sums of money is overwhelming if a candidate is to prevail in the run-off. The short period of time allowed is insufficient to respond to new attacks on a candidate's qualifications, position or platform and therefore such a campaign lends itself to dirty tactics, assuming there is such a thing as Marquis of Queensberry rules in politics. Furthermore, he expressed a firm view that voters in a one to one run-off election following such a short intense campaign are more likely to vote on racial lines.
 
 
 86
 614 F.Supp. at 1536. Taking that testimony as true, as I believe the district court did, the closed primary run-off election law of New York acts to discourage minority candidates from seeking office and lessens the chances for success of those who choose to run. In my opinion, such a result violates section 2 of the Voting Rights Act by having the effect of discouraging equal participation in the electoral process by minority voters and in lessening their opportunity to elect representatives of their choice. Accordingly, I dissent.
 
 
 
 [1]
 The plaintiffs had also alleged that Sec. 6-162 violated the first, thirteenth, and fifteenth amendments. Judge Brieant held that there were no first or thirteenth amendment violations, and, because he found that the Equal Protection claim existed, he saw no need to rule on the fifteenth amendment claim. Because we hold that the run-off law does not violate the fourteenth amendment, and because the standard for a fourteenth amendment violation is the same as the standard for a fifteenth amendment violation, see Mobile v. Bolden, 446 U.S. 55, 62, 100 S.Ct. 1490, 1497, 64 L.Ed.2d 47 (1980), we also hold that Sec. 6-162 does not violate the fifteenth amendment
 
 
 [2]
 The original version of the run-off bill differed from the present version in that it applied to any city in New York State that had a population of over one million. Because New York City was and is the only city in the state with such a population, the law's scope of application is the same now as it was when originally enacted
 
 
 [3]
 Although the Attorney General was provided on January 3, 1985, with the requisite statutory notice that plaintiffs were challenging the constitutionality of Sec. 6-162, he did not appear in the district court to defend the bill. He has, however, submitted an amicus brief urging reversal
 
 
 [4]
 The reasoning of the dissent ultimately reduces to this "difficulty of victory" test for application of Section 2. In Judge Oakes's view, Sec. 6-162 makes it less likely that a minority candidate will be elected to one of the three offices the law covers, and therefore diminishes minority "participation" under the Voting Rights Act. As we have noted, we believe that this interpretation is supported neither by the legislative history of the Act, nor by the case law applying Section 2
 
 
 [5]
 Actually, it is unsettled whether Section 2 can be violated at all in the absence of discriminatory results, although Judge Brieant seems to have assumed that it can. Whereas Section 5 of the Voting Rights Act (which applies only to "covered" jurisdictions) speaks in terms of the "tendency" to affect voting rights, Section 2 seems more concerned with discriminatory results. See S.Rep. No. 97-417, reprinted in 1982 U.S.Code Cong. & Ad.News 177, 246. It is undisputed that the run-off law has not yet had any actual discriminatory effect. On the contrary, the only minority candidate to whom it has applied, Herman Badillo, was given a second chance to win the mayoralty nomination in 1973 by virtue of the law
 We believe that the plaintiffs can challenge Sec. 6-162 solely on the basis of its anticipated effects. In the case of Gingles v. Edmisten, 590 F.Supp. 345 (E.D.N.C.1984), prob. jur. noted, --- U.S. ----, 105 S.Ct. 2137, 85 L.Ed.2d 495 (1985), the district court held that a Section 2 case may be brought in advance of any harmful results. See id., 590 F.Supp. at 363, citing White v. Regester, 412 U.S. 755, 93 S.Ct. 2332, 37 L.Ed.2d 314 (1973). It is true that Regester is distinguishable from this case because, although the Regester Court struck down an at-large system in advance of its operation, the system there had merely been reinstated and had previously operated in a discriminatory fashion. Nonetheless, we agree with Gingles and its interpretation of Regester. If we read Section 2 to require actual harmful effects, no one could challenge the run-off law until it had in fact caused the defeat of a minority candidate who won in the initial primary. This would be improper because, as the Gingles court pointed out, discriminatory voting laws have more subtle harms that commence as soon as they are enacted (such as deterring minority candidates from seeking office). See id., 590 F.Supp. at 363. In this case, however, there has been no showing that the run-off law tends to have any harmful effect.
 
 
 [1]
 I believe that a finding of racial-bloc voting is a "keystone" in a section 2 case, see, e.g., United States v. Marengo County Comm'n, 731 F.2d 1546, 1566-67 (11th Cir.), cert. denied, --- U.S. ----, 105 S.Ct. 375, 83 L.Ed.2d 311 (1984); see also United Jewish Orgs. v. Carey, 430 U.S. at 166 n. 24, 97 S.Ct. at 1010 n. 24. Although the evidence here is not overwhelming, the district court's finding of racial-bloc voting cannot be deemed clearly erroneous. The judge relied on both statistical (regression analysis) and somewhat anecdotal evidence on city-wide (and state and national) elections from 1973 to 1984. The trial courts similarly relied on anecdotal and statistical evidence in City of Rome v. Georgia, 472 F.Supp. 221, 227 (D.D.C.1979), aff'd sub nom. City of Rome v. United States, 446 U.S. 156, 183-84 & n. 20, 100 S.Ct. 1548, 1564-65 & n. 20, 64 L.Ed.2d 119 (1980); and in Major v. Treen, 574 F.Supp. 325, 351 (E.D.La.1983). Other courts have found bloc voting by analyzing even fewer results. See, e.g., Latino Political Action Comm. v. Boston, 609 F.Supp. 739, 745 (D.Mass.1985) (two elections). The time period considered--1973-1984--was almost as long or longer than that considered by other courts. See, e.g., Marengo County Comm'n, 731 F.2d at 1551-52 (1966-78); Gingles, 590 F.Supp. at 367 & n. 28 (1978-82, although 53 elections studied); Latino Political Action Comm., 609 F.Supp. at 745 (1983 only); Jordan v. City of Greenwood, 599 F.Supp. 397, 402 (N.D.Miss.1984) (1969-81). Nor was the district court's discounted consideration of national or state issue elections improper. City of Rome, 472 F.Supp. at 227. Although the regression analysis did not show bloc voting to the extent found in some Southern areas, it was statistically significant
 The appellants challenge the court's failure to consider evidence of "cross-over" voting in local New York City elections. However, the district court's finding that the willingness of white voters to vote for blacks for less visible and important positions is not probative on how whites vote in city-wide elections does not appear to be clear error. The contention that plaintiffs must demonstrate why voters voted racially should be rejected, as this would render Congress's amendment of section 2 inoperative by again making the proof burden insurmountable. Thus, the court's finding of racial polarization was not clear error, nor were improper legal standards applied. Compare Lee County Branch of NAACP v. City of Opelika, 748 F.2d 1473, 1481 (11th Cir.1984) (Wisdom, J.).
 
 
 [2]
 This information is set forth in Attachment C to the amicus brief of Citizens Union of the City of New York submitted in support of reversal of Judge Brieant's decision
 
 
 [3]
 Judge Brieant noted that a 30% level might pass muster. 614 F.Supp. at 1556. I do not reach that question